68 F.3d 736
 William H. FLAMER
v.
STATE OF DELAWARE; Darl Chaffinch; Raymond Callaway;
Harold K. Brode; William H. Porter; Gary A. Myers; Loren
C. Meyers; Dana Reed; James E. Liguori; Charles M.
Oberly, III; Walter Redman; Stanley W. Taylor, Acting
Warden; Warden Robert Snyder;
William Henry Flamer, Appellant.
Billie BAILEY, Appellant,
v.
Robert SNYDER, Warden, Delaware Correctional Center.
 Nos. 93-9000, 93-9002.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 16, 1994.
Argued April 26, 1994.
Reargued In Banc Nov. 22, 1994.
Decided Oct. 19, 1995.
 
 Charlene D. Davis (Argued), Bayard, Handelman & Murdoch, P.A., Wilmington, DE, Joshua L. Simon, Law Office of David Staats, Wilmington, DE, for appellant Flamer.
 Gary A. Myers (Argued), Paul R. Wallace, Carl C. Danberg, Deputy Attorney General, Department of Justice, Wilmington, DE, for appellees.
 Edmund D. Lyons, Jr. (Argued), David Jay Lyons, Wilmington, DE, for appellant Bailey.
 Paul R. Wallace (Argued), Deputy Attorney General, Department of Justice, Wilmington, DE, for appellee Snyder.
 Argued Feb. 16, 1994.
 Before: BECKER, HUTCHINSON* and ALITO, Circuit Judges.
 Reargued In Banc Nov. 22, 1994.
 Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON*, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE and SAROKIN, Circuit Judges.
 Argued April 26, 1994.
 Before: MANSMANN, COWEN, and LEWIS, Circuit Judges.
 Reargued In Banc Nov. 22, 1994.
 Before: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON*, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE & SAROKIN, Circuit Judges.
 OPINION OF THE COURT
 ALITO, Circuit Judge:
 
 
 1
 This opinion of the in banc court concerns two appeals from orders of the United States District Court for the District of Delaware that denied habeas corpus petitions filed by two state prisoners, William Henry Flamer and Billie Bailey, who were separately tried for unrelated double homicides and sentenced to death. The appeals were initially heard by two separate panels of this court during roughly the same period. Both prisoners argued, among other things, that their death sentences should be vacated pursuant to Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), because Delaware, in the parlance of the Supreme Court's Eighth Amendment decisions, is a "weighing state" and because the juries in both cases were instructed at the penalty phase regarding certain statutory aggravating factors that were either impermissibly vague or duplicative. Before a panel opinion was filed in either appeal, the court voted to rehear these cases in banc for the purpose of addressing the prisoners' related arguments.
 
 
 2
 Agreeing with the two district court judges who denied the prisoners' petitions and with the unanimous Supreme Court of Delaware, we now hold that Delaware is not a "weighing state," that Clemons is therefore inapplicable, and that the governing Supreme Court precedent is Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). Applying Zant, we hold that the strikingly similar jury instructions and interrogatories used in these two cases did not violate the Eighth Amendment. We also find no merit in Bailey's remaining arguments. In this opinion, we do not address Flamer's many other arguments, but in a separate opinion that is being filed simultaneously with this opinion, the panel that originally heard Flamer's appeal rejects all of Flamer's other arguments. Accordingly, the district court orders in both cases will be affirmed.
 
 I.
 
 3
 A. The background of Flamer's appeal is set out in the panel opinion that is being filed together with this opinion, and therefore a detailed statement is not needed here. Flamer was arrested in 1979 for murdering his elderly aunt and uncle during a robbery at their home. In early 1980, he was tried and convicted on four charges of first-degree murder: two charges of intentionally causing the death of another person, Del.Code Ann. tit. 11 Sec. 636(a)(1), and two charges of felony murder, Del.Code Ann. tit. 11, Sec. 636(a)(2). He was also found guilty of other non-capital offenses. After the jury returned these verdicts, the state sought the imposition of the death penalty.
 
 
 4
 At the time of Flamer's trial,[1] Del.Code Ann. tit. 11, Sec. 4209(d)(1) provided in pertinent part as follows:
 
 
 5
 A sentence of death shall not be imposed unless the jury or judge, where appropriate, finds:
 
 
 6
 a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and
 
 
 7
 b. Unanimously recommends, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed.
 
 
 8
 See Flamer v. State, 490 A.2d 104, 146 (Del.1983). Nineteen statutory aggravating circumstances were listed in Del.Code Ann. tit. 11, Sec. 4209(e)(1).[2] In addition, the statute provided that a statutory aggravating circumstance would be deemed to have been established if a defendant was convicted under certain subsections of the Delaware first-degree murder statute, Del.Code Ann. tit. 11, Sec. 636(a)(2)-(7).[3] Thus, under these provisions, a Delaware jury at the penalty phase of a capital case was required to perform two steps. In the first step, which we will hereafter call the "eligibility" step, the jury was required to determine whether at least one statutory aggravating circumstance had been (or was deemed to have been) proven. In the second step, which we will call the "selection" step, the jury was required to weigh all of the pertinent evidence in aggravation (not just the statutory aggravating circumstances) and all of the evidence in mitigation.
 
 
 9
 In Flamer's case, a statutory aggravating circumstance was deemed to have been established by virtue of his convictions on two charges of felony murder (Del.Code Ann. tit. 11, Sec. 636(a)(2)). See supra page 740. In addition, the prosecution argued that three other statutory aggravating circumstances had been proven, namely, (1) that Flamer's conduct had "resulted in the deaths of 2 or more persons where the deaths [were] a probable consequence of [that] conduct,"[4] (2) that the murders were "outrageously or wantonly vile, horrible, or inhuman,"[5] and (3) that the murders were committed "for pecuniary gain."[6] The prosecution urged the jury to impose the death sentence based on these circumstances and certain non-statutory aggravating factors, including Flamer's prior criminal record, the age of his two victims, the frailty of his aunt, and Flamer's exploitation of his aunt and uncle's trust in order to gain entrance to their home. Flamer Joint Appendix ("JA") at 1485-86. The jury was given instructions that are discussed in detail in Part III of this opinion. The jury then returned a verdict recommending[7] that a sentence of death be imposed. On a special interrogatory form, which is also discussed in detail in Part III, the jury found that all three of the additional statutory aggravating circumstances alleged by the prosecution had been established, and the jury indicated that it had relied on all of the statutory aggravating circumstances in making its recommendation.
 
 
 10
 Shortly after this verdict was returned, the United States Supreme Court handed down its decision in Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), which concerned the Georgia sentencing scheme, upon which, according to the Supreme Court of Delaware, the Delaware scheme "was obviously fashioned." State v. White, 395 A.2d 1082, 1085 (Del.1978). Under the Georgia scheme, like the Delaware scheme, the jury was first required to determine whether at least one statutory aggravating circumstance had been proven. See Zant v. Stephens, 462 U.S. at 871, 103 S.Ct. at 2739-40. If the jury found that such a circumstance had been shown, the jury was then called upon to consider all pertinent aggravating and mitigating evidence in determining whether a death sentence should be imposed. Id. at 871-72, 103 S.Ct. at 2739-40.
 
 
 11
 In Godfrey, the defendant had killed his wife and mother-in-law "instantly" by shooting them in the head with a shotgun. 446 U.S. at 425, 100 S.Ct. at 1763. In sentencing the defendant to death, the jury found one statutory aggravating factor to have been proven, i.e., that the murders were "outrageously or wantonly vile, horrible, or inhuman, in that [they] involved torture, depravity of mind, or an aggravated battery to the victim." Id. at 426, 100 S.Ct. at 1763. The jury found that this statutory aggravating factor had been proven even though the prosecution had not claimed that the murders had involved "torture" or an "aggravated battery" (other than the homicides themselves) and even though the jury's answers on a sentencing questionnaire indicated that neither torture nor an aggravated battery (other than the murders) had been found. Id.
 
 
 12
 The Georgia Supreme Court affirmed the death sentence, but the United States Supreme Court reversed. In the plurality opinion that embodied the Court's holding,[8] Justice Stewart observed that a valid capital sentencing scheme "must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.' " Id. at 428, 100 S.Ct. at 1765 (footnotes omitted). The plurality concluded that the challenged statutory aggravating circumstance, as apparently interpreted by the Georgia Supreme Court in Godfrey, did not fulfill this requirement. The plurality wrote:
 
 
 13
 In the case before us, the Georgia Supreme Court has affirmed a sentence of death based upon no more than a finding that the offense was "outrageously or wantonly vile, horrible and inhuman." There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence. A person of ordinary sensibility could fairly characterize almost every murder as "outrageously or wantonly vile, horrible and inhuman." Such a view may, in fact, have been one to which the members of the jury in this case subscribed.
 
 
 14
 Id. at 428-29, 100 S.Ct. at 1765 (footnote omitted). The plurality opinion subsequently added that there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." Id. at 433, 100 S.Ct. at 1767.
 
 
 15
 Following this decision, the Supreme Court of Delaware, in Petition of State for Writ, 433 A.2d 325 (1981), held that the statutory aggravating circumstance set out in Del.Code Ann. tit. 11, Sec. 4209(e)(1)n--that "[t]he murder was outrageously or wantonly vile, horrible, or inhuman"--was, like its Georgia counterpart, too vague to channel a sentencer's discretion in a capital case. As previously noted, this circumstance was found by the jury in Flamer's case, but three other statutory aggravating circumstances had also been proven. Thus, in Flamer's direct appeal, the Supreme Court of Delaware was required to decide whether the jury's reliance on one vague statutory aggravating circumstance necessitated the reversal of Flamer's death sentence, even though other statutory aggravating circumstances had also been proven.
 
 
 16
 While Flamer's direct appeal was pending, the United States Supreme Court addressed a similar question in Zant v. Stephens, supra, which again involved the Georgia capital sentencing scheme.[9] In Zant, the jury had found that three statutory aggravating circumstances had been proven, and it had imposed a sentence of death. 462 U.S. at 866-67, 103 S.Ct. at 2737-38. One of these statutory aggravating circumstances was subsequently held by the Georgia Supreme Court to be too vague to satisfy the standard adopted in Godfrey. See id. at 867, 103 S.Ct. at 2737-38. Nevertheless, the United States Supreme Court held that reversal of the death sentence in Zant was not required. The Court, however, specifically reserved decision as to whether its holding would apply in so-called "weighing states," which have a capital sentencing scheme significantly different from Georgia's. Id. at 890, 103 S.Ct. at 2749-50.
 
 
 17
 After carefully analyzing the United States Supreme Court's decision in Zant and related cases, the Supreme Court of Delaware held that Flamer's sentence should be upheld. Flamer v. State, 490 A.2d at 131-36. The Supreme Court of Delaware held that Delaware is not a "weighing state" and wrote:
 
 
 18
 While the jury in Delaware is told to weigh and consider certain circumstances, the fact that they are not told how to weigh them and that this "weighing" occurs at the discretionary stage, renders defendant's argument meaningless.
 
 
 19
 Id. at 135-36. The Delaware Supreme Court further found that the instructions had not placed excessive emphasis on the vague statutory circumstance and that the references to that circumstance were harmless. Id. at 136. Responding to Flamer's argument that two of the statutory aggravating factors--that the murders were committed during the felony of robbery and that the murders were committed for pecuniary gain--were duplicative, the Delaware Supreme Court likewise observed that "nowhere did the trial court suggest 'that the presence of more than one aggravating circumstance should be given special weight.' " 490 A.2d at 136 (quoting Zant, 462 U.S. at 891, 103 S.Ct. at 2750).
 
 
 20
 In his federal habeas corpus petition, Flamer renewed his argument that the jury's finding of one invalid statutory aggravating circumstance required the reversal of his death sentence, but the district court agreed with the analysis of the Supreme Court of Delaware. Flamer v. Chaffinch, 827 F.Supp. 1079, 1094-97 (D.Del.1993). This appeal followed.
 
 
 21
 B. Bailey committed the two murders for which he was sentenced to death while assigned to the Plummer House, a work release facility in Wilmington, Delaware. Bailey v. Snyder, 855 F.Supp. 1392, 1396-97 (D.Del.1993). After escaping from the Plummer House, Bailey appeared at the home of his foster sister, Sue Ann Coker, in Cheswold, Delaware. Id. at 1397. Bailey told his foster sister that he was upset and was not going back to the Plummer House. Id. A short time later, Bailey and Charles Coker, his foster sister's husband, left in Coker's truck to run an errand. Id. On the way, Bailey asked Coker to stop at a package store. Id. Bailey then entered the store and robbed the clerk at gunpoint. Id. Emerging from the store with a pistol in one hand and a bottle in the other, Bailey told Coker that the police would soon be arriving, and he asked to be dropped at Lambertson's Corner, about one and one-half miles away. Id. Coker complied and then drove back to the scene of the robbery, where he inquired about the clerk and telephoned the Delaware State Police. Id.
 
 
 22
 In the meantime, Bailey had entered the farmhouse of Gilbert Lambertson, age 80, and his wife, Clara Lambertson, age 73. Id. Bailey shot Gilbert Lambertson twice in the chest with a pistol and once in the head with the Lambertsons' shotgun. Id. at 1392. He shot Clara Lambertson once in the shoulder with the pistol and once in the abdomen and once in the neck with the shotgun. Id. Both Lambertsons died. Id.
 
 
 23
 Bailey fled from the scene but was spotted by a Delaware State Police helicopter unit as he ran across the Lambertsons' field. Id. He attempted to shoot the helicopter co-pilot with the pistol, but he was apprehended. Id.
 
 
 24
 Bailey was charged with first-degree murder and other offenses, and he was tried at approximately the same time as Flamer, but before a different judge. After the jury found Bailey guilty, the state sought the death penalty. Bailey v. State, 490 A.2d 158, 172 (Del.1983). The state argued that it had established the existence of the following four statutory aggravating circumstances: (1) that the murders were committed by one who had escaped from a place of confinement,[10] (2) that the murders were committed while the defendant was engaged in flight after committing a robbery,[11] (3) that the defendant's course of conduct resulted in the deaths of two people where the deaths were a probable consequence of the defendant's conduct,[12] and (4) that the murders were "outrageously or wantonly vile, horrible, or inhuman."[13] Id. The judge gave the jury instructions that were virtually identical to those given in Flamer's case. Id. at 173. The jury then returned a verdict recommending the imposition of a death sentence. On an interrogatory form that is also virtually the same as that used in Flamer's case, the jury indicated that it had found that all four of the alleged statutory factors had been proven. See Bailey v. Snyder, 855 F.Supp. at 1409. The jury further indicated that, in recommending a death sentence, it had relied on two of those circumstances--that the defendant's conduct had resulted in the deaths of two persons where the deaths were a probable consequence of the defendant's conduct and that the murders were outrageously or wantonly vile, horrible, or inhuman. Id.
 
 
 25
 On direct appeal, the Supreme Court of Delaware considered whether Bailey's death sentences had to be vacated because the jury had found the existence of one invalid statutory aggravating circumstances (i.e., that the murders were "outrageously or wantonly vile, horrible, or unhuman"). Bailey v. State, 490 A.2d at 172-74. The Delaware Supreme Court handed down its decisions regarding the death sentences in Flamer's and Bailey's cases on the same day. In Bailey's case, the State Supreme Court relied on its analysis in its Flamer opinion and affirmed Bailey's death sentence. Id. at 173-74.
 
 
 26
 Bailey subsequently filed the federal habeas petition that is now before us and argued, among other things, that the jury's finding of a single invalid statutory aggravating circumstance required the reversal of his death sentence. Bailey v. Snyder, 855 F.Supp. at 1408. Bailey's petition was assigned to a different district court judge from Flamer's, but the judge in Bailey's case reached the same conclusion as the judge in Flamer's. Agreeing with the Supreme Court of Delaware that Delaware is a "non-weighing state" and that Zant is the governing precedent, the district court held that the Bailey jury's finding of a single invalid statutory aggravating circumstance did not require the reversal of Bailey's death sentence. Id. at 1408-11. Bailey then took this appeal.
 
 II.
 
 27
 A. On appeal, both Flamer and Bailey argue that Delaware is a "weighing" state; that Clemons v. Mississippi, supra, not Zant, is therefore the pertinent Supreme Court precedent; and that under Clemons the juries' reliance on one or more invalid statutory aggravating circumstances means that their death sentences cannot stand unless there is a judicial reweighing of the evidence without consideration of the invalid circumstances or unless it is determined that the juries' consideration of those circumstances was harmless. In order to assess these arguments, it is necessary to explain the difference between what the Supreme Court has termed "weighing" and "non-weighing" states.
 
 
 28
 B. At the time of the Supreme Court's decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), "sentencing juries had almost complete discretion in determining whether a given defendant would be sentenced to death...." Johnson v. Texas, --- U.S. ----, ----, 113 S.Ct. 2658, 2664, 125 L.Ed.2d 290 (1993). "The guiding principle that emerged from Furman was that the States were required to channel the discretion of sentencing juries in order to avoid a system in which the death penalty would be imposed in a 'wanto[n]' and 'freakis[h]' manner." Id. (citation omitted) (brackets in original). Since then, the Supreme Court has repeatedly said that a state's capital sentencing scheme "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant, 462 U.S. at 877, 103 S.Ct. at 2742; see also Tuilaepa v. California, --- U.S. ----, ----, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994); Arave v. Creech, --- U.S. ----, ----, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993); Godfrey, 446 U.S. at 428-29, 100 S.Ct. at 1764-65. This narrowing is typically achieved by permitting the imposition of a death sentence only if the trier of fact finds at either the guilt or penalty phase that at least one statutorily specified aggravating circumstance has been proven. See Tuilaepa, --- U.S. at ----, 114 S.Ct. at 2634; Lewis v. Jeffers, 497 U.S. 764, 774, 110 S.Ct. 3092, 3098-99, 111 L.Ed.2d 606 (1990); Blystone v. Pennsylvania, 494 U.S. 299, 306-07, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990). Such a finding makes a defendant " 'eligible' for the death penalty." See Tuilaepa, --- U.S. at ----, 114 S.Ct. at 2634; Lewis, 497 U.S. at 774, 110 S.Ct. at 3099.
 
 
 29
 Because the aggravating factors listed in a state's capital sentencing statute perform this critical narrowing function, the Supreme Court has insisted that these factors be defined with some precision, for if they are too vague they can leave "the kind of open-ended discretion which was held invalid in Furman." Maynard v. Cartwright, 486 U.S. 356, 362, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988). As previously explained, it was for this reason that the Court held that the circumstance at issue in Godfrey--whether the murders were "outrageously or wantonly vile, horrible or inhuman"--was inadequate to channel the jury's eligibility determination. In Maynard v. Cartwright, 486 U.S. at 362, 108 S.Ct. at 1858, the Court subsequently reached the same conclusion with respect to the circumstance of whether the murder was "especially heinous, atrocious, or cruel." Although the statutorily defined aggravating circumstances at issue in Godfrey and Maynard refer to underlying considerations that may properly be taken into account in deciding whether a death sentence should be imposed, their flaw is that they do not adequately narrow the factfinder's discretion in determining whether a defendant should be found to be eligible for a death sentence. See Maynard, 486 U.S. at 361-62, 108 S.Ct. at 1857-58; Zant, 462 U.S. at 885-89, 103 S.Ct. at 2747-49.
 
 
 30
 "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty," a state is free to allow "the jury ... to consider a myriad of factors to determine whether death is the appropriate punishment." California v. Ramos, 463 U.S. 992, 1008, 103 S.Ct. 3446, 3457, 77 L.Ed.2d 1171 (1983). A state must permit the factfinder to consider all mitigating evidence. Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978). But a state has considerable leeway with respect to the role of aggravating factors at this stage. One permissible method is exemplified by the Georgia sentencing scheme at issue in Zant v. Stephens. Another permissible method is exemplified by the scheme discussed in Clemons v. Mississippi.
 
 
 31
 C. Zant, as previously noted, involved the Georgia capital sentencing scheme. Under that scheme, as described by the Georgia Supreme Court in response to a question certified from the Supreme Court of the United States, the factfinder at the penalty phase was first required to determine whether at least one of the aggravating circumstances enumerated by statute was present. See 462 U.S. at 870-72, 103 S.Ct. at 2739-40. If the factfinder found at least one of these circumstances, the factfinder was then required to " 'consider[ ] all evidence in extenuation, mitigation and aggravation of punishment.' " Id. at 871, 103 S.Ct. at 2740 (quoting 250 Ga. 97, 297 S.E.2d 1, 3-4 (1982)).
 
 
 32
 In Zant, after the defendant, Stephens, was found guilty of murder, the state requested that the jury impose the death penalty and argued that the following aggravating circumstances listed in the Georgia statute were present: (1)(a) that the defendant had "a prior record of conviction for a capital felony" or (b) "a substantial history of serious assaultive criminal convictions"; (2) that the offense was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim"; and (3) that the defendant had escaped from lawful custody or confinement. Id. at 865 n. 1, 103 S.Ct. at 2736. The jury imposed the death penalty and stated that it had found the presence of the aggravating circumstances labeled above as (1)(a) (that the defendant had a prior conviction for a capital felony), (1)(b) (that he had a substantial history of serious assaultive criminal convictions), and (3) (that he had escaped from lawful custody or confinement). Id. at 866-67, 103 S.Ct. at 2737-38.
 
 
 33
 The Georgia Supreme Court subsequently held in another case, Arnold v. State, 236 Ga. 534, 224 S.E.2d 386, 392 (1976), that circumstance (1)(b)--a "substantial history of serious assaultive criminal convictions"--was unlawfully vague for Eighth Amendment purposes. In light of this decision, the Georgia Supreme Court considered whether the jury's finding of this improper aggravating circumstance rendered Stephens's death sentence invalid. The court concluded that it did not, because the other circumstances found by the jury adequately supported Stephens's sentence. See Stephens v. State, 237 Ga. 259, 227 S.E.2d 261 cert. denied, 429 U.S. 986, 97 S.Ct. 508, 50 L.Ed.2d 599 (1978); Stephens v. Hopper, 241 Ga. 596, 247 S.E.2d 92, 97-98, cert. denied, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 667 (1978).
 
 
 34
 The Fifth Circuit, however, held that the jury's consideration of this circumstance rendered Stephens's sentence unconstitutional. Among other things, the Fifth Circuit concluded that the reference to this factor in the jury instructions "may have unduly directed the jury's attention to [Stephens's] prior convictions." Stephens v. Zant, 648 F.2d 446 (5th Cir.1981). The Fifth Circuit added that it could not be "determined with the degree of certainty required in capital cases that the instruction did not make a critical difference in the jury's decision to impose the death penalty." Id.
 
 
 35
 The Supreme Court reversed. The Court noted that the finding of a statutory aggravating circumstance played a limited role under the Georgia scheme. Such a finding "narrow[ed] the class of persons convicted of murder who are eligible for the death penalty" but did not thereafter "play any role in guiding the sentencing body in the exercise of its discretion." 462 U.S. at 874, 103 S.Ct. at 2741. Concluding that this scheme sufficiently structured the sentencer's discretion, the Court wrote:
 
 
 36
 Our cases indicate ... that statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: They circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.
 
 
 37
 Id. at 878, 103 S.Ct. at 2743 (emphasis added).
 
 
 38
 The Court then considered whether, under this scheme, the jury's finding of one vague statutory aggravating circumstance necessitated the reversal of Stephens's death sentence even though other valid statutory aggravating circumstances were also found. The Court held that it did not. After noting that the jury had "found aggravating circumstances that were valid and legally sufficient to support the death penalty," id. at 881, 103 S.Ct. at 2745, the Court rejected Stephens's argument that reversal was necessary because the trial judge's instructions concerning the invalid statutory aggravating circumstance "may have affected the jury's deliberations," id. at 885, 103 S.Ct. at 2747. The Court wrote:
 
 
 39
 In analyzing this contention it is essential to keep in mind the sense in which that aggravating circumstance is 'invalid.' It is not invalid because it authorizes the jury to draw adverse inferences from conduct that is constitutionally protected.... Georgia [has not] attached the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant, ... or to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness.
 
 
 40
 Id. at 885, 103 S.Ct. at 2747 (citations omitted). Rather, the Court observed, the circumstance in question had been found to be invalid because it failed "to provide an adequate basis for distinguishing a murder case in which the death penalty may not be imposed." Id. at 886, 103 S.Ct. at 2747. But the Court pointed out that "[t]he underlying evidence [was] nevertheless fully admissible at the sentencing phase." Id.
 
 
 41
 Responding to the Fifth Circuit's statement that the judge's instruction "may have unduly directed the jury's attention to [Stephens's] prior conviction," the Supreme Court assumed that the instruction had in fact "induc[ed] the jury to place greater emphasis upon the [defendant's] prior criminal record than it would otherwise have done." Id. at 888, 103 S.Ct. at 2749. The Court held, however, that this emphasis had not violated Stephens's constitutional rights. The Court stated that it would have been constitutional for the trial judge to instruct the jury that "it would be appropriate to take account of a defendant's prior criminal record in making its sentencing determination," id., and the Court saw little difference between such an instruction and the one actually given. Id. The Court thus commented that "[t]he effect the erroneous instruction may have had on the jury is therefore merely a consequence of the statutory label 'aggravating circumstance.' " Id. While "[t]hat label arguably might have caused the jury to give somewhat greater weight to [the defendant's] prior criminal record than it otherwise would have given," the Court observed, "any possible impact cannot fairly be regarded as a constitutional defect in the sentencing process." Id. at 888-89, 103 S.Ct. at 2748-49 (emphasis added). In reaching this conclusion, however, the Court withheld opinion "concerning the possible significance of a holding that a particular aggravating circumstance is 'invalid' under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggravating and mitigating circumstances in exercising its discretion whether to impose the death penalty." Id. at 890, 103 S.Ct. at 2749.
 
 
 42
 D. The Court considered a sentencing scheme of this latter type in Clemons v. Mississippi, supra. Under the Mississippi scheme, like the Georgia scheme, the factfinder at the penalty phase of a capital case was first required to find the presence of at least one statutory aggravating circumstance. See 494 U.S. at 744-45, 110 S.Ct. at 1446. But the two schemes differed with respect to the next step that the factfinder was instructed to perform. Whereas the Georgia scheme called for the factfinder to consider all aggravating evidence, the Mississippi scheme required the factfinder to consider only those aggravating elements enumerated in the statute and to weigh those elements against the mitigating circumstances. See id. at 743 n. 1, 745 n. 2, 110 S.Ct. at 1445 n. 1, 1446 n. 2. The Clemons Court--employing terminology that can be quite misleading in the context of the cases now before us--described Mississippi as a "weighing" state because its statute called for the jury to "weigh" the statutory aggravating circumstances against the mitigating circumstances. See id. at 748-49, 110 S.Ct. at 1448-49.
 
 
 43
 In Clemons, the jury found the presence of two statutorily defined aggravating factors--that the murder was committed during a robbery for pecuniary gain and that the murder was "especially heinous, atrocious, or cruel." Id. at 742, 110 S.Ct. at 1445. Concluding that these factors outweighed any mitigating circumstances, the jury imposed a sentence of death. Id. The second of the statutory aggravating factors was later held to be unconstitutionally vague for Eighth Amendment purposes. See Maynard, 486 U.S. at 362, 108 S.Ct. at 1858. Noting that Mississippi was a "weighing state" and that the jury had weighed this statutory factor in imposing a death sentence, the Court vacated that sentence and remanded for the Mississippi Supreme Court to determine whether the remaining valid statutory aggravating circumstance outweighed the mitigating circumstances or to conduct a harmless error review. See 494 U.S. at 741, 110 S.Ct. at 1444.
 
 
 44
 In subsequent decisions, the Supreme Court has provided explanations of the reasoning on which the holding in Clemons rests. For example, in Sochor v. Florida, 504 U.S. 527, 532-33, 112 S.Ct. 2114, 2119, 119 L.Ed.2d 326 (1992), the Court explained:[14]
 
 
 45
 In a weighing state ... there is Eighth Amendment error when the sentencer weighs an "invalid" aggravating circumstance in reaching the ultimate decision to impose a death sentence. See Clemons v. Mississippi, 494 U.S. 738, 752, 110 S.Ct. 1441, 1450, 108 L.Ed.2d 725 (1990). Employing an invalid aggravating factor in the weighing process "creates the possibility ... of randomness," Stringer v. Black, 503 U.S. 222, 236, 112 S.Ct. 1130, 1139, 117 L.Ed.2d 367 (1992), by placing a "thumb [on] death's side of the scale," id. at 243, 112 S.Ct. at 1137, thus "creat[ing] the risk [of] treat[ing] the defendant as more deserving of the death penalty," id. at 235, 112 S.Ct. at 1139. Even when other valid aggravating factors exist as well, merely affirming a sentence reached by weighing an invalid aggravating factor deprives a defendant of "the individualized treatment that would result from actual reweighing of the mix of mitigating factors and aggravating circumstances." Clemons, supra, 494 U.S. at 752, 110 S.Ct. at 1450....
 
 
 46
 E. In order to illustrate the reason for the distinction that the Supreme Court has drawn between "non-weighing" states like Georgia and "weighing" states like Mississippi, it is helpful to compare how the effect of the invalid aggravating circumstance in Zant would differ at the selection step in the two types of states. As previously noted, the invalid statutory aggravating circumstance in Zant was "a substantial history of serious assaultive criminal convictions." Due to its vagueness, this standard created a serious danger that different juries would reach different conclusions based on identical facts. If, for example, a defendant had two prior convictions, one for a mugging and one for a barroom fight, some juries might well conclude that these convictions satisfied the standard, while others might well reach the opposite conclusion. At the "selection" step in a "non-weighing" state, however, this possibility would not carry with it an unacceptably high risk of altering the jury's ultimate sentencing decision. This is so because, whether or not the jury found that the standard had been met, it would still consider the same underlying facts, i.e., that the defendant had one prior conviction for a mugging and one for a barroom fight.
 
 
 47
 By contrast, in a "weighing" state, this vague standard would create an unacceptably high risk of affecting the jury's decision at the selection step. Those juries that concluded that the standard had been met could consider the defendant's prior convictions, and this factor might well tip the balance in favor of the death penalty. On the other hand, those juries that concluded that the standard had not been met could not consider the defendant's prior convictions at all, and this might well tip the balance against the death penalty. Accordingly, as the Supreme Court has put it, "[e]mploying an invalid aggravating factor in the weighing process 'creates the possibility ... of randomness,' ... thus 'creat[ing] the risk of treat[ing] the defendant as more deserving of the death penalty.' " Sochor, 504 U.S. at 532, 112 S.Ct. at 2119 (citations omitted; brackets in original).
 
 
 48
 F. With this background in mind, it seems quite clear that Delaware is a "non-weighing" state. Under the Delaware scheme, the jury at the selection step of the penalty phase is free to consider all relevant evidence in aggravation. The jury is not restricted to the statutory aggravating factors. In this critical feature, the Delaware scheme mirrors the Georgia capital sentencing scheme discussed in Zant and contrasts sharply with the Mississippi capital sentencing scheme discussed in Clemons. We therefore agree with the analysis of the Delaware Supreme Court and the district court judges who denied the petitions that are now before us. See Flamer v. Chaffinch, 827 F.Supp. at 1095; Bailey v. Snyder, 826 F.Supp. at 822; Flamer v. State, 490 A.2d at 135.
 
 
 49
 Flamer's and Bailey's argument that Delaware is a "weighing" state is no more than a play on the use of the word "weigh" in the Delaware statute. Flamer and Bailey argue that Delaware is a weighing state because the Delaware statute states that in the "selection" step the jury must "[u]nanimously recommend[ ], after weighing all relevant evidence ... that a sentence of death be imposed." Del.Code Ann. tit. 11 Sec. 4209(d)(1)(b) (emphasis added). They distinguish the Georgia statute on the ground that it provided that "the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence...." See Zant, 462 U.S. at 865 n. 1, 103 S.Ct. at 2736 n. 1. (emphasis added). Flamer and Bailey argue that Delaware is a "weighing" state simply because the Delaware statute instructs the jury to "weigh" (not consider) aggravating and mitigating circumstances. See Flamer Br. at 74; Bailey Br. at 64.
 
 
 50
 We reject these arguments. "[T]he difference between a weighing State and a non-weighing State is not one of 'semantics.' " Stringer, 503 U.S. at 231, 112 S.Ct. at 1137. "The Supreme Court's weighing/non-weighing distinction does not turn simply on whether or not the word weighing appears in a state's statute." Williams v. Calderon, 52 F.3d 1465, 1477 (9th Cir.1995). The fact that the Delaware statute employs the term "weigh" rather than the term "consider" is inconsequential for present purposes. The term "weigh" is defined as meaning "consider or examine for the purpose of forming an opinion or coming to a conclusion" and "consider carefully esp[ecially] by balancing one ... thing against another in order to make a choice, decision or judgment," Webster's Third New International Dictionary 2593 (1973) (emphasis added); similarly, a synonym of "consider" is "weigh." Id. at 483. Thus, the Delaware legislature's choice of the word "weighing" rather than "considering" is of no Eighth Amendment significance.
 
 III.
 
 51
 A. Bailey and Flamer next argue that, even if Delaware is a "non-weighing" state, their death sentences must nevertheless be reversed because of the particular nature of the jury instructions and interrogatories used in their cases. As we have mentioned, the instructions and interrogatories given in these two cases were virtually identical. (The relevant portions of the instructions and interrogatories in both cases are set out in appendices to this opinion.)
 
 
 52
 In both cases, the trial judges, quoting Del.Code Ann. tit. 11, Sec. 4209(d)(1), told the jurors:
 
 
 53
 A sentence of death shall not be imposed until the jury finds:
 
 
 54
 1. Beyond a reasonable doubt at least one statutory aggravating circumstance; and
 
 
 55
 2. Unanimously recommend, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstance or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed.
 
 
 56
 Appendix A, infra, at 759 (emphasis added); Appendix C, infra, at 762 (emphasis added). The judges also told the jurors that Delaware law specified certain statutory aggravating circumstances and that "[t]he State may likewise offer matters in aggravation besides the statutory aggravating circumstances." Appendix A, infra, at 759 (emphasis added); Appendix C, infra, at 762 (emphasis added).
 
 
 57
 The judges then listed the statutory aggravating circumstances that the state contended had been proven in each case, and both judges also pointed out to the juries that their verdicts at the guilt phase had already established the existence of at least one statutory aggravating factor--in Flamer's case that the murders had occurred during the commission of the felony of robbery,[15] and in Bailey's case that the defendant had caused the death of two persons where the deaths were the probable consequences of his conduct.
 
 The judges subsequently told the juries:
 
 58
 The law provides that a sentence of death shall not be imposed unless you find beyond a reasonable doubt at least one statutory aggravating circumstance and unanimously recommend, after weighing all relevant evidence in aggravation ... and mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed.
 
 
 59
 See Appendix A, infra, at 760 (emphasis added); Appendix C, infra, at 762 (emphasis added). Shortly thereafter, both judges reiterated:
 
 
 60
 In conclusion, a sentence of death shall not be imposed unless you, the jury, find beyond a reasonable doubt that at least one statutory aggravating circumstance has been established and unanimously recommend a sentence of death be imposed after weighing all relevant evidence in aggravation and mitigation which bear upon the particular circumstance and details of the commission of the offense and the character and propensities of the offender.
 
 
 61
 See Appendix A, infra, at 760 (emphasis added); Appendix C, infra, at 763 (emphasis added).
 
 
 62
 The judges then turned to the interrogatory forms that were used in both cases. The first question on these forms asked:
 
 
 63
 1. Does the jury unanimously find that the following statutory aggravating circumstance or circumstances exist?
 
 
 64
 See Appendix B, infra, at 761; Appendix D, infra, at 763. This question was followed by a list of the statutory aggravating circumstances, and after each circumstance a spot was provided for the jury to check either "Yes" or "No."[16] Id. The judges in both cases instructed the juries to check these statutory aggravating circumstances if they found them to have been established beyond a reasonable doubt. Appendix A, infra, at 760-61; Appendix C, infra, at 763.
 
 The second interrogatory question was:
 
 65
 2. Does the jury unanimously recommend a sentence of death be imposed?
 
 
 66
 See Appendix B, infra, at 761; Appendix D, infra, at 763. Under this question were spots for the jury to mark "Yes" or "No." Id.
 
 
 67
 The third and final question--which is the focal point of the arguments concerning the jury instructions and interrogatories--stated:
 
 
 68
 3. If the jury unanimously recommends that a sentence of death be imposed, please indicate which statutory aggravating circumstance or circumstances were relied upon.
 
 
 69
 See Appendix B, infra, at 761; Appendix D, infra, at 763-64. This question, like the first, was followed by a list of statutory aggravating circumstances, and spaces were furnished under each circumstance for the jury to mark "Yes" or "No."[17] Id. The judges in both cases told the juries:
 
 
 70
 If you recommend the death penalty, you will then indicate on the written interrogatory which statutory aggravating circumstance or circumstances ... you relied upon in reaching your decision.
 
 
 71
 See Appendix A, infra, at 761; Appendix C, infra, at 764.
 
 
 72
 Based on these instructions and interrogatories, two separate arguments are made.
 
 
 73
 B. The initial argument is that, even if the Delaware statute "on its face" created a "non-weighing" scheme, jury interrogatory # 3 and the corresponding portion of the instructions converted the Delaware sentencing scheme "as applied" into a "de facto" weighing scheme. (For convenience, we will use the term "interrogatory # 3" to refer to both the interrogatory itself and the corresponding portion of the instructions.). In support of this argument, it is contended that interrogatory # 3 mistakenly suggested to the jury that, at the selection step, it could not rely on non-statutory aggravating circumstances but was limited to those aggravating circumstances set out in the Delaware statute. Accordingly, since it is the hallmark of a "weighing" scheme to require the jury at the selection step to rely on only the statutory aggravating factors, it is argued that interrogatory # 3 made the Delaware scheme a "de facto" "weighing" scheme "as applied." We disagree with this argument for two reasons.
 
 
 74
 1. First, we believe that the instructions in both cases, when viewed in their entirety, made it quite clear that the juries, at the selection step, were free to consider any evidence in aggravation and thus were not required to restrict their consideration to only the statutory aggravating factors. In both cases, the trial judges instructed the juries three times that, at the selection step, they were to "weigh[ ] all relevant evidence in aggravation and mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender." Moreover, written copies of the instructions were given to the juries for their use during deliberations in both cases. Flamer JA at 1466; Bailey Tr. of 2/15/80 at 275-76. At a fourth place in the instruction, the juries were told that the state was permitted to "offer matters in aggravation besides the statutory aggravating circumstances." Thus, the juries in both cases were expressly, unambiguously, and repeatedly told that, at the selection step, they were free to consider non-statutory aggravating circumstances.
 
 
 75
 While it is now argued that jury interrogatory # 3 conveyed a conflicting message, it is important to note that this interrogatory did not expressly contradict the instructions quoted above. In other words, interrogatory # 3 did not expressly inform the juries that they could not consider non-statutory aggravating evidence. Instead, as noted, interrogatory # 3 merely told the juries that, if they unanimously recommended a death sentence, they should indicate "which statutory aggravating circumstance or circumstances were relied upon."[18] The worst that can fairly be said of the wording of this interrogatory question is that it might be read to suggest that the jury could not recommend a death sentence unless it relied, at least in part, on a statutory aggravating circumstance.
 
 
 76
 It is, of course, well established that a jury instruction may not be judged " 'in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record.' " Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400-01, 38 L.Ed.2d 368 (1973)). The same rule, we believe, should apply to a jury interrogatory. Therefore, in the cases now before us, we must consider the entire charge and interrogatories to determine whether, as a result of interrogatory # 3, there was a "reasonable likelihood" that the jurors were led to believe that they could not consider non-statutory aggravating factors at the "selection" step. See Estelle, 502 U.S. at 72-73 n. 4, 112 S.Ct. at 482 n. 4; Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990); Rock v. Zimmerman, 959 F.2d 1237, 1247 & n. 3 (3d Cir.) (in banc), cert. denied, 505 U.S. 1222, 112 S.Ct. 3036, 120 L.Ed.2d 905 (1992).
 
 
 77
 As we have noted, the juries were expressly, clearly, and repeatedly instructed, orally and in writing, that at the "selection" step they were to weigh all relevant evidence in aggravation. We do not think that there was a "reasonable likelihood" that the juries, in the face of these express instructions, nevertheless inferred from interrogatory # 3 that they were actually limited to considering the statutory aggravating circumstances. See Shannon v. United States, --- U.S. ----, ----, 114 S.Ct. 2419, 2427, 129 L.Ed.2d 459 (1994) (it is " 'the almost invariable assumption of the law that jurors follow their instructions' ") (quoting Richardson v. Marsh, 481 U.S. 200, 206, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1982)). If the jury in either case had interpreted interrogatory # 3 as implying such a restriction--and thus as directly conflicting with the clear and explicit instructions repeatedly given by the trial judges--the reasonable thing for the jury to have done would have been to have asked for clarification on this point. But no such request was made in either case.[19]
 
 
 78
 For these reasons, we are convinced that the instructions and interrogatories in each case, when viewed in their entirety, made it clear that the jury, at the selection step, was free to consider all evidence in aggravation, and was not limited to the statutory aggravating circumstances.
 
 
 79
 2. Second, even if this point had not been made clear and the juries had been left with the mistaken belief that they could consider only the statutory aggravating circumstance at the selection step, we are at a loss to understand how this could have materially prejudiced these defendants. It is not claimed that interrogatory # 3 restricted the juries in their consideration of any evidence in mitigation, i.e., any evidence that might have been helpful to the defendants. Instead, it is claimed that interrogatory # 3 improperly restricted the aggravating evidence that the juries could consider. We can understand how an improper restriction on aggravating evidence could harm the prosecution, but it simply makes no sense to argue that death sentences should be overturned because the juries were unduly restricted in their consideration of the evidence militating in favor of the death penalty.
 
 
 80
 C. The remaining argument is that the references to invalid statutory aggravating circumstances in the instructions and interrogatories in these two cases violated the Eighth Amendment because they led the juries to give much greater weight or consideration to the facts underlying the invalid statutory aggravating circumstances than those facts would otherwise have received. We see no merit in this argument.
 
 
 81
 In large part, this argument relies on the effect of the statutory label "aggravating circumstance," and to this extent this contention is foreclosed by the Supreme Court's decision in Zant. There, as previously noted, the Supreme Court recognized that such a label "arguably might have caused the jury to give somewhat greater weight to petitioner's prior criminal record than it otherwise would have given." 462 U.S. at 888, 103 S.Ct. at 2748. Nevertheless, the Court held that "any possible impact" resulting from the use of that label "could not fairly be regarded as a constitutional defect in the sentencing process." Id. at 889, 103 S.Ct. at 2749 (footnote omitted).
 
 
 82
 While Zant would thus appear to be controlling, it is argued that in the cases now before us interrogatory # 3, by suggesting that the juries could not consider non-statutory aggravating factors at the selection step, placed far more emphasis on the invalid factors than occurred in Zant. There are, however, at least three fatal flaws in this argument.
 
 
 83
 First, we see no difference of constitutional dimension between the directions given to the jury in these cases and those given to the jury in Zant. In the cases now before us, interrogatory # 3 and the corresponding portion of the instructions told the juries that, if they unanimously recommended a death sentence, they should indicate "which statutory aggravating circumstance or circumstances were relied upon." In Zant, the jury was told:
 
 
 84
 If the jury verdict on sentencing fixes punishment at death by electrocution, you shall designate in writing, signed by the foreman, the aggravating circumstance or circumstances which you have found to have been proven beyond a reasonable doubt.
 
 
 85
 462 U.S. at 866, 103 S.Ct. at 2737.
 
 
 86
 Second, as discussed above, we reject the argument that the instructions and interrogatories in the cases before us, when considered in their entirety, created a "reasonable likelihood" that the juries were led to believe that, at the selection step, they were not free to consider all evidence in aggravation, as opposed to only the statutory aggravating circumstances.
 
 
 87
 Finally, even if the juries had believed that they could not consider non-statutory aggravating factors at the selection step, this would not have naturally caused the juries to give the facts underlying the invalid statutory aggravating circumstances any greater weight than those facts would have otherwise received. An example may help to clarify this point. Suppose that, at the selection step in a non-weighing state like Delaware, there are three items of aggravating evidence. One item does not fall within any of the statutory aggravating circumstances; let us say it is a prior history of convictions for property crimes. Another item falls within an unobjectionable statutory aggravating circumstance; let us say that this item is the killing of more than one person. The final item falls within a vague statutory aggravating circumstance. Let us say that the vague statutory aggravating circumstance is that the murders were "heinous," and let us say that the prosecution contends that the murders were "heinous" because they were carried out in a particularly painful manner. If the jury in this hypothetical case was erroneously led to believe that it could not consider non-statutory factors at the selection step, the jury would not consider the first item--the prior history of convictions for property crimes. But we do not understand why this unwarranted restriction would result in the jury's giving the facts underlying the vague factor--that the murders were allegedly committed in a particularly painful manner--any greater weight than those facts would have otherwise received. The jury would consider the second and third statutory factors; and as we explicate supra in Part II C, the third factor, because it was specific aggravating evidence of the painful manner of causing death in this case, would be relevant. See Zant, 462 U.S. at 885, 103 S.Ct. at 2747. The fact that the jury considered only two of the three permissible aggravating factors would not give undue weight to either of the two factors considered; nor would the jury consider any impermissible factor. Id. Hence, we are unpersuaded by the argument that the erroneous message allegedly conveyed by interrogatory # 3 in the cases before us somehow led the juries to give greater weight to the facts underlying the invalid statutory aggravating circumstances.
 
 
 88
 For all these reasons, we reject the contention that these cases can be distinguished from Zant on the ground that the references in these cases to invalid statutory aggravating circumstances led the juries to give much greater weight to the facts underlying those circumstances. On the contrary, we find Zant to be controlling, and we therefore reject the petitioners' arguments.[20]
 
 IV.
 
 89
 We now turn to Bailey's additional arguments.[21] We will first discuss those that concern the guilt phase of his trial, and will then address those that pertain to the penalty phase.
 
 
 90
 A. Guilt Phase.
 
 
 91
 1. Bailey first argues that the trial court violated his constitutional right to an impartial jury by denying his request for a change of venue due to prejudicial pretrial publicity in Kent County, where the murders occurred. Bailey does not contend that any of the jurors who sat on his case were biased or that the trial judge erred in denying any challenges for cause. Rather, Bailey maintains that "the publicity in this case ... combined with widespread contact by members of the [venire] prior to trial resulted in ... such a 'wave of public passion' that made a fair trial unlikely in Kent County no matter the record assurances of impartiality of the twelve jurors who decided Bailey's fate." Bailey Br. at 31.
 
 
 92
 Bailey's argument relies chiefly on Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), which "held that adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." Patton v. Yount, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2888, 81 L.Ed.2d 847 (1984). Irvin, however, was a case involving "extraordinary publicity," Mu'Min v. Virginia, 500 U.S. 415, 427, 111 S.Ct. 1899, 1906, 114 L.Ed.2d 493 (1991), that had a remarkably prejudicial effect on the minds of potential jurors. See id. at 428, 111 S.Ct. at 1906-07. In order to invoke Irvin's presumption of prejudice, "[t]he community and media ... reaction must have been so hostile and so pervasive as to make it apparent that even the most careful voir dire process would be unable to assure an impartial jury." Rock v. Zimmerman, 959 F.2d at 1252. "Such cases are exceedingly rare." Id. at 1253. See also United States v. De Peri, 778 F.2d 963, 972 (3d Cir.1985) ("It is the rare case in which adverse pretrial publicity will create a presumption of prejudice that overrides the jurors' assurances that they can be impartial.").
 
 
 93
 The record in this case falls far short of satisfying the Irvin standard. In support of his motion for a change of venue, Bailey relied on a series of articles in the Delaware State News that appeared between May 22, 1979, the day after the murders, and June 13, 1979. The Delaware Supreme Court accurately characterized these stories as follows:
 
 
 94
 [T]he articles were indisputably factual in nature, but prejudicial and inflammatory only to the extent arising from the normal and natural reaction to any purely factual news item about a very serious crime.
 
 
 95
 490 A.2d at 162. In addition, as the Delaware Supreme Court noted, many of the stories centered, not so much on Bailey or the facts of the murders, but on the political controversy about the work release program. See Bailey Joint Appendix ("Bailey JA") at 247, 250, 252, 254, 255, 258. We have read the articles on which Bailey relied, and we conclude that they are neither quantitatively nor qualitatively comparable to the publicity in Irvin. Indeed, the pretrial publicity in this case was clearly no more extensive or prejudicial than that in cases such as Mu'Min,[22] Patton,[23] Murphy v. Florida, 421 U.S. 794, 799, 95 S.Ct. 2031, 2035-36, 44 L.Ed.2d 589 (1974), and United States v. Provenzano, 620 F.2d 985, 995-96 (3d Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980), in which no presumption of prejudice was found.
 
 
 96
 It is also significant that there was a lapse of eight months between the publication of the last newspaper story on which Bailey relied (June 13, 1979) and the start of jury selection (February 12, 1980). "That time soothes and erases is a perfectly natural phenomenon, familiar to all." Patton, 467 U.S. at 1034, 104 S.Ct. at 2890. In Murphy, the Supreme Court noted that extensive publicity had stopped about seven months before jury selection and found no presumption of prejudice. 421 U.S. at 802, 95 S.Ct. at 2037. See also Patton, 467 U.S. at 1035 n. 11, 104 S.Ct. at 2891 n. 11. In this case, the Delaware Supreme Court appropriately reached a similar conclusion. 490 A.2d at 162.
 
 
 97
 Finally, the effect of the publicity in this case on the members of the venire was not at all comparable to that in Irvin--or even in Patton. "In Irvin, the trial court excused over half of a panel of 430 persons because their opinions of the defendant's guilt were so fixed that they could not be impartial, and 8 of the 12 jurors who sat had formed an opinion as to guilt." Mu'Min, 500 U.S. at 428, 111 S.Ct. at 1907. In Patton, "all but 2 of the 163 veniremen questioned about the case had heard of it," "77% ... admitted they would carry an opinion into the jury box," and "8 of the 14 jurors and alternates actually seated admitted that at some time they had formed an opinion as to [the defendant's] guilt." 467 U.S. at 1029, 104 S.Ct. at 2888.
 
 
 98
 In this case, Bailey cannot show that the pretrial publicity or the community familiarity with the case had any comparable effect on the members of the venire. The most that Bailey claims is that about one-half of the venirepersons answered in the affirmative when they were asked a group of eight questions touching on many matters in addition to familiarity with the case.[24] Moreover, only one juror and one alternate were taken from the group of venirepersons who answered any of these questions in the affirmative; neither of these two individuals expressed any familiarity with the case; and Bailey did not move to excuse either for cause. See 855 F.Supp. at 1407-08.
 
 
 99
 For these reasons, we hold that no presumption of prejudice is justified in this case and that the trial judge's denial of Bailey's motion for a change of venue did not violate Bailey's constitutional right to an impartial jury.
 
 
 100
 2. Bailey next contends that his constitutional right to due process was violated as a result of improper statements made by the prosecution during closing argument at the guilt phase of his trial. The district court analyzed this argument at length and concluded that it did not provide a basis for granting the writ. See 855 F.Supp. at 1402-04. We are in essential agreement with the district court's analysis.
 
 
 101
 Bailey did not raise this argument at trial, and when he first raised it during the state post-conviction proceedings, it was found to have been procedurally defaulted under state law. See Bailey JA at 19-24, 37a. Thus, federal habeas review of this claim is barred unless Bailey can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 724, 111 S.Ct. 2546, 2551, 115 L.Ed.2d 640 (1991).
 
 
 102
 Bailey contends that he demonstrated "cause" because his trial attorneys' failure to object at trial violated his constitutional right to the effective assistance of counsel pursuant to the standard set out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Such a violation would provide "cause," see Coleman, 501 U.S. at 724, 111 S.Ct. at 2551; Carrier, 477 U.S. at 488, 106 S.Ct. at 2645, but we agree with the district court, 855 F.Supp. at 1402-04, and the state Superior Court, Bailey JA at 23, that Bailey has not shown that his experienced attorneys were constitutionally deficient. One of these attorneys, Howard Hillis, testified that he decided not to object at trial for strategic reasons; this explanation was credited by the Superior Court, Bailey JA at 22; and that finding is binding on us in this proceeding. See 28 U.S.C. Sec. 2254(d). In addition, as the district court observed:
 
 
 103
 [I]t was objectively reasonable for Hillis to conclude that the prosecutor's acerbic comments undermined the State's case more than they hurt Bailey's case. It was also objectively reasonable for Hillis to respond to the prosecutor's remarks by addressing them in his own closing argument rather than by making an objection, as Hillis believed the trial judge would not be receptive to such an objection.
 
 
 104
 855 F.Supp. at 1404.
 
 
 105
 Furthermore, we agree with the district court, id., and the state Superior Court, Bailey JA at 23, that Bailey has not shown that his attorneys' failure to object at trial resulted in "prejudice" under the Strickland test--i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. We also hold that failure to consider Bailey's argument would not "result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 724, 111 S.Ct. at 2551. Moreover, even if we were to consider Bailey's argument, we would concur with the district court that Bailey has not shown that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." 855 F.Supp. at 1404 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). See also, e.g., Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); Todaro v. Fulcomer, 944 F.2d 1079, 1082 (3d Cir.1991), cert. denied, 503 U.S. 909, 112 S.Ct. 1271, 117 L.Ed.2d 498 (1992).
 
 
 106
 3. Bailey's final argument concerning the guilt phase of his trial is that his constitutional right to due process was violated when the trial judge, in his jury instructions, described a "reasonable doubt" as a "substantial doubt." Bailey contends that this instruction was unconstitutional under Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). However, Bailey did not object to this instruction at trial, and the Delaware courts held in the post-conviction proceedings that his objection was procedurally barred under state law. See Bailey JA at 26, 37a. Bailey contends that he is nevertheless entitled to federal habeas review because he has demonstrated "cause" and "prejudice." He maintains that "cause" was established because his attorneys' failure to object at trial constituted constitutionally ineffective assistance. We hold that Bailey's reasonable doubt claim must be rejected.
 
 
 107
 We agree with the district court that federal habeas review of this claim is barred due to Bailey's procedural default.[25] Although Bailey contends that the allegedly ineffective assistance of his trial attorneys demonstrated "cause" for this default, we find this argument to be insubstantial. Bailey's trial occurred long before Cage. Just one year before Bailey's trial, the Delaware Supreme Court had approved an instruction virtually identical to the one given here. See Wintjen v. State, 398 A.2d 780, 781 n. 2 (Del.1979). In addition, the use of the phrase "substantial doubt" was supported by federal case law. See United States v. Smith, 468 F.2d 381, 383 (3d Cir.1972) ("Reasonable doubt of itself is substantial.... It is sufficient if the jury understands reasonable doubt to mean 'a real or substantial doubt' generated by the evidence or lack of it."). Under the circumstances, the failure of Bailey's attorneys to object to the reference in the instructions to "substantial doubt" did not fall below an objective standard of reasonableness. Strickland, 466 U.S. at 687-91, 104 S.Ct. at 2064-66. Consequently, Bailey's attorneys did not render constitutionally ineffective assistance, and Bailey cannot show "cause" for the procedural default.
 
 
 108
 Moreover, failure to consider Bailey's claim will not result in a "fundamental miscarriage of justice," Coleman, 501 U.S. at 750, 111 S.Ct. at 2565. We find strong support for this holding in Victor v. Nebraska, --- U.S. ----, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). In Victor, the Supreme Court held that due process was not violated by jury instructions that described reasonable doubt as follows:
 
 
 109
 A reasonable doubt is an actual and substantial doubt arising from the evidence, from the facts or circumstances shown by the evidence, or from the lack of evidence on the part of the state, as distinguished from a doubt arising from mere possibility, from bare imagination, or from fanciful conjecture.
 
 
 110
 Id. at ----, 114 S.Ct. at 1249 (emphasis added). The Court noted two definitions of the term "substantial": "not seeming or imaginary" and "that specified to a large degree." Id. (quoting Webster's Third New International Dictionary, 2280 (2d ed. 1979)). Finding the first definition "unexceptionable" but the latter ambiguous, the Court wrote:
 
 
 111
 Any ambiguity, however, is removed by reading the phrase in the context of the sentence in which it appears: "A reasonable doubt is an actual and substantial doubt ... as distinguished from a doubt arising from mere possibility, from mere imagination, or from fanciful conjecture." This explicit distinction between a substantial doubt and a fanciful conjecture was not present in the Cage instruction.
 
 
 112
 Id. at ----, 114 S.Ct. at 1250.
 
 
 113
 We find the challenged portion of the jury instructions in this case to be essentially the same as that in Victor. Here, the judge told the jury:
 
 
 114
 Reasonable doubt does not mean a vague, speculative or whimsical doubt, nor a mere possible doubt, but a substantial doubt and such a doubt as intelligent, reasonable and impartial men and women may honestly entertain after a careful and conscientious consideration of the evidence in the case.
 
 
 115
 Bailey JA at 168-69. Thus, just as the Victor instruction contrasted a "substantial doubt" with "a doubt arising from a mere possibility, from bare imagination, or from fanciful conjecture," the instruction here contrasted a "substantial doubt" with "a mere possible doubt," "a vague, speculative" doubt, and a "whimsical doubt."
 
 
 116
 It is true that the Supreme Court in Victor went on to observe that "[i]n any event," the instruction in that case provided an accurate, "alternative definition of reasonable doubt, a doubt that would cause a reasonable person to hesitate to act." --- U.S. at ----, 114 S.Ct. at 1250. However, as Supreme Court's use of the phrase "in any event" suggests, we do not interpret the Court's opinion to mean that this alternative definition was essential to its holding. Accordingly, we believe that Victor supports the constitutionality of the challenged instruction in this case and, in any event, clearly shows that it did not result in a fundamental miscarriage of justice.
 
 
 117
 B. Penalty Phase. Bailey contends that his death sentences should be overturned for two reasons in addition to those discussed in Parts II and III of this opinion.
 
 
 118
 1. First, Bailey argues that certain statements made by the prosecutors during opening and closing arguments at the penalty hearing violated his right to due process. However, Bailey's attorneys did not object to any of these comments, and his argument concerning these remarks was held in the state post-conviction proceedings to be barred for procedural default under state law. Although Bailey contends that his attorneys' failure to object amounted to constitutionally ineffective assistance and thus established "cause" for the procedural default, we agree with the district court, for essentially the same reasons explained in that court's opinion, that Bailey did not satisfy either prong of the Strickland test and that federal habeas review of this claim is therefore barred. See 855 F.Supp. at 1406.
 
 
 119
 2. Second, Bailey maintains that the trial court violated his constitutional rights by instructing the jury at the penalty phase that, by virtue of its verdicts finding Bailey guilty of the first-degree murders of Gilbert and Clara Lambertson, it had already found the existence of one of the statutory aggravating circumstances--engaging in a "course of conduct [that] resulted in the deaths of 2 or more persons where the deaths are a probable consequence of the defendant's conduct." Del.Code Ann. tit. 11, Sec. 4209(e)(1)k. Relying on Arizona v. Rumsey, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984), Bailey argues that "a penalty hearing is 'like a trial' on the issue of punishment." Bailey's Br. at 70. Bailey then notes that due process prohibits the use of conclusive presumptions at a trial, see Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and he likens the judge's instruction to a conclusive presumption. He consequently argues that the court's instruction violated due process.
 
 
 120
 We see no merit in this argument. The guilt and penalty phases of a capital trial are parts of a single proceeding, and there is no constitutional requirement that they be treated as if they were two entirely separate trials. The Supreme Court has held that a state may constitutionally employ a plan that provides for the same jury to sit in both the guilt and penalty phases of a capital murder trial. See Lockhart v. McCree, 476 U.S. 162, 180-81, 106 S.Ct. 1758, 1768-69, 90 L.Ed.2d 137 (1986); Gregg v. Georgia, 428 U.S. 153, 160, 163, 96 S.Ct. 2909, 2920, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, J.J.). When such a plan is used, evidence that is admitted at the guilt phase may be considered by the jury at the penalty phase. Lockhart, 476 U.S. at 180-81, 106 S.Ct. at 1768-69. Furthermore, the finding of a statutory aggravating circumstance may occur either at the guilt or penalty phase. See Tuilaepa, --- U.S. at ----, 114 S.Ct. at 2634 ("[W]e have indicated that the trier of fact must ... find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase."); Lowenfield v. Phelps, 484 U.S. 231, 244-46, 108 S.Ct. 546, 554-55, 98 L.Ed.2d 568 (1988). We therefore see no federal constitutional error in the trial court's instructing the jury that its verdicts at the guilt phase (finding that Bailey had murdered Gilbert and Clara Lambertson) had already established the existence of one statutory aggravating circumstance (that his conduct had "resulted in the deaths of 2 or more persons where the deaths [were] the probable consequence of the defendant's conduct").
 
 
 121
 In any event, even if this instruction were erroneous, the error would be harmless.[26] Since the jury had just found Bailey guilty of intentionally killing the two Lambertsons, there can be no reasonable doubt that, even if the challenged instruction had not been given, the jury would have found at the penalty phase that Bailey had engaged in conduct that caused the deaths of two people and that these deaths were the probable consequences of his conduct.[27]
 
 V.
 
 122
 In summary, we reject Bailey's and Flamer's arguments concerning the references in the jury instructions and interrogatories to certain vague or duplicative aggravating circumstances. We also reject all of Bailey's remaining arguments. Accordingly, the orders of the district court denying the petitions for writs of habeas corpus will be affirmed in both cases.
 
 APPENDIX A
 
 123
 Flamer Jury Instructions (Flamer JA at 1460-65)
 
 
 124
 I shall instruct you as to the applicable principles of law governing the punishment to be imposed in this case. No single one of these instructions states all of the law applicable to this determination. Therefore, you should listen to and consider all the instructions together. You are to apply the law to these facts and in this way decide the punishment to be imposed in the case.
 
 
 125
 The criminal code says as follows: "Upon a conviction of guilt of a defendant of first degree murder, the Superior Court shall conduct a separate hearing to determine whether the defendant shall be sentenced to death or to life imprisonment without benefit of probation or parole.
 
 
 126
 "A sentence of death shall not be imposed until the jury finds:
 
 
 127
 "1. Beyond a reasonable doubt at least one statutory aggravating circumstance; and
 
 
 128
 "2. Unanimously recommend, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed. Where the jury submits such a finding and recommendation, the Court will sentence the defendant to death. A finding by the jury of a statutory aggravating circumstance, and a consequent recommendation of death, supported by the evidence, shall be binding on the Court."
 
 
 129
 The Delaware law specifies certain statutory aggravating circumstances which the State may contend exist in a particular case. The law does not specify mitigating circumstances, but the defense may offer evidence relating to any mitigating circumstances which it contends exist in a particular case. The State may likewise offer matters in aggravation besides the statutory aggravating circumstances.
 
 
 130
 An aggravating circumstance is a factor which tends to make the defendant's conduct more serious, or the imposition of a penalty of death appropriate. A mitigating circumstance is any factor which tends to make the defendant's conduct less serious, or the imposition of a penalty of death inappropriate.
 
 
 131
 In this case the State contends that the following four statutory aggravating circumstances exist:
 
 
 132
 1. The murder was committed while the defendant was engaged in the commission of robbery.
 
 
 133
 2. The defendant's course of conduct resulted in the deaths of two or more persons where the deaths are a probable consequence of the defendant's conduct.
 
 
 134
 3. The murders were outrageously or wantonly vile, horrible or inhuman.
 
 
 135
 4. The murders were committed for pecuniary gain.
 
 
 136
 You cannot recommend that this defendant be sentenced to death unless you find beyond a reasonable doubt that at least one statutory aggravating circumstance exists.
 
 
 137
 In this regard an applicable portion of the Delaware law provides that in any case where the defendant has been convicted of murder in the first degree in violation of 11 Delaware Code, Section 636(a)(2) that conviction shall establish the existence of a statutory aggravating circumstance.
 
 
 138
 In this case the defendant has been convicted of violating 11 Delaware Code, Section 636(a)(2) which reads: "Murder in the first degree. A person is guilty of murder in the first degree when in the course of and in furtherance of the commission of a felony, he recklessly causes the death of another person."
 
 
 139
 Therefore, that statutory aggravating circumstances has been established beyond a reasonable doubt, and you are so instructed.
 
 
 140
 The law provides that a sentence of death shall not be imposed unless you find beyond a reasonable doubt at least one statutory aggravating circumstance and unanimously recommend, after weighing all relevant evidence in aggravation, including but not limited to the statutory aggravating circumstance or circumstances that you have already found to exist, and mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed. You are to weigh any mitigating factors against the aggravating factors to determine the penalty.
 
 
 141
 If you have a reasonable doubt about the existence of any statutory aggravating circumstance, you must give the defendant the benefit of that reasonable doubt and find that the statutory aggravating circumstance does not exist.
 
 
 142
 I would remind you a reasonable doubt means a doubt based upon good and sufficient reasons and common sense.
 
 
 143
 Your unanimous recommendation for the imposition of the death penalty, if supported by the evidence, is binding on the Court. Similarly, if you are not unanimous in your recommendation to impose the death penalty, or you cannot agree unanimously as to your recommendations, then the Court is bound to impose a sentence of life imprisonment without benefit of probation or parole.
 
 
 144
 In conclusion, a sentence of death shall not be imposed unless you, the jury, find beyond a reasonable doubt at least one statutory aggravating circumstance has been established and unanimously recommend a sentence of death be imposed after weighing all relevant evidence in aggravation and mitigation which bear upon the particular circumstances and details of the commission of the offense and the character and propensities of the offender.
 
 
 145
 Should you fail to agree unanimously to either of these two matters, the Court shall sentence the defendant to life imprisonment without benefit of probation or parole.
 
 
 146
 As I have previously instructed, you have found a statutory aggravating circumstance by returning verdicts of guilty of murder in the first degree in violation of 11 Delaware Code, Section 636(a)(2), recklessly causing the death during commission of a felony. You will be given a written interrogatory on which to indicate if you find any additional statutory aggravating circumstance. If you do not unanimously find beyond a reasonable doubt the existence of any additional aggravating circumstance, you should indicate accordingly.
 
 
 147
 You will next indicate on the written interrogatory that will be given to you whether the jury unanimously recommends that a death sentence be imposed.
 
 
 148
 If you recommend the death penalty, you will then indicate on the written interrogatory which statutory aggravating circumstance or circumstances, including the violation of 11 Delaware Code, Section 636(a)(2), you relied upon in reaching your decision.
 
 APPENDIX B
 
 149
 Flamer Jury Interrogatories (Flamer Rec. at 30)
 
 
 150
 1. Does the jury unanimously find that the following statutory aggravating
 
 
 151
 circumstance or circumstances exist?
 
 
 152
 (a) The
 
 
 153
 defendant's
 
 
 154
 course of
 
 
 155
 conduct
 
 
 156
 resulted in
 
 
 157
 the deaths
 
 
 158
 of two or
 
 
 159
 more
 
 
 160
 persons
 
 
 161
 where the
 
 
 162
 deaths are
 
 
 163
 a probable
 
 
 164
 consequence
 
 
 165
 of the
 
 
 166
 defendant's
 
 
 167
 conduct?
 
 Yes __X__ No _____
 
 168
 (b) The murder was outrageously or wantonly vile, horrible or inhuman?
 
 Yes __X__ No _____
 
 169
 (c) The murder was committed for pecuniary gain?
 
 Yes __X__ No _____
 
 170
 2. Does the jury unanimously recommend that a sentence of death be imposed:
 
 Yes __X__ No _____
 
 171
 3. If the jury unanimously recommends that a sentence of death be imposed,
 
 
 172
 please indicate which statutory aggravating circumstance or circumstances
 
 
 173
 were relied upon:
 
 
 174
 (a) The murder was committed while the defendant was engaged in the
 
 
 175
 commission of a robbery.
 
 Yes __X__ No _____
 
 176
 (b) The defendant's course of conduct resulted in the deaths of two or more
 
 
 177
 persons where the deaths are a probable consequence of the
 
 
 178
 defendant's conduct.
 
 Yes __X__ No _____
 
 179
 (c) The murder was outrageously or wantonly vile, horrible or inhuman.
 
 Yes __X__ No _____
 
 180
 (d) The murder was committed for pecuniary gain.
 
 Yes __X__ No _____APPENDIX C
 
 181
 Bailey Jury Instructions (Bailey Tr. of 2/25/1980 at 270-75)
 
 
 182
 I shall now instruct you as to the applicable principles of law governing the punishment to be imposed in this case. No single one of these instructions states all of the law applicable to this determination; therefore you must listen to and consider all of these instructions together. You are to apply the law to the facts and in this way decide the punishment to be imposed in the case.
 
 The criminal code provides as follows:
 
 183
 Upon a conviction of guilt of a defendant of first degree murder, the Superior Court shall conduct a separate hearing to determine whether the defendant should be sentenced to death or to life imprisonment without benefit of probation or parole or any other reduction.
 
 
 184
 "A sentence of death shall not be imposed unless the jury finds:
 
 
 185
 "1. Beyond a reasonable doubt at least one statutory aggravating circumstance; and,
 
 
 186
 "2. Unanimously recommend, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that a sentence of death be imposed. Where the jury submits such a finding and recommendation, the Court shall sentence the defendant to death. A finding by the jury of a statutory aggravating circumstance, and a consequent recommendation of death supported by the evidence, shall be binding on the Court."
 
 
 187
 The Delaware law specifies certain statutory aggravating circumstances which the State may contend exist in a particular case. The law does not specify mitigating circumstances, but the defense may offer evidence relating to mitigating circumstances which it contends exist in a particular case. The State may likewise offer matters in aggravation besides the statutory aggravating circumstances.
 
 
 188
 An aggravating circumstance is a factor which tends to make the defendant's conduct more serious or the imposition of a penalty of death appropriate. A mitigating circumstance is any factor which tends to make the defendant's conduct less serious or the imposition of a penalty of death inappropriate.
 
 
 189
 In this case, the State contends the following four statutory aggravating circumstances exist:
 
 
 190
 1. The murders were committed by one who had escaped from a place of confinement.
 
 
 191
 2. The murders were committed while the defendant was engaged in flight after committing robbery.
 
 
 192
 3. The defendant's course of conduct resulted in the deaths of two persons where the deaths were a probable consequence of the defendant's conduct.
 
 
 193
 4. The murders were outrageously or wantonly vile, horrible or inhuman.
 
 
 194
 You cannot recommend this defendant be sentenced to death unless you find beyond a reasonable doubt that at least one statutory aggravating circumstance exists.
 
 
 195
 You have already convicted the defendant of causing the death of two persons; therefore, that aggravating circumstance has been established beyond a reasonable doubt and you are so instructed.
 
 
 196
 The law provides that a sentence of death shall not be imposed unless you find beyond a reasonable doubt at least one statutory aggravating circumstance and unanimously recommend, after weighing all relevant evidence in aggravation and mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender that a sentence of death be imposed. You are to weigh any mitigating factors against the aggravating factors to determine the penalty.
 
 
 197
 If you have a reasonable doubt about the existence of any statutory aggravating circumstance, you must give the defendant the benefit of that reasonable doubt and find that that statutory aggravating circumstance does not exist.
 
 
 198
 I would remind you that reasonable doubt means a doubt based upon good and sufficient reason and common sense.
 
 
 199
 Your unanimous recommendation for the imposition of the death penalty, if supported by the evidence, is binding on the Court. Similarly, if you are not unanimous in your recommendation to impose the death penalty, or you cannot agree unanimously as to your recommendation, then the Court is bound to impose a sentence of life imprisonment without benefit of probation or parole.
 
 
 200
 In conclusion, a sentence of death shall not be imposed unless, the jury, find:
 
 
 201
 1. Beyond a reasonable doubt at least one statutory aggravating circumstance has been established; and
 
 
 202
 2. Unanimously recommend that a sentence of death be imposed after weighing all relevant evidence in aggravation and mitigation which bear upon the particular circumstances and details of the commission of the offense and the character and propensities of the offender.
 
 
 203
 Should you fail to agree unanimously to either of those two matters, the Court shall sentence the defendant to life imprisonment without benefit of probation or parole.
 
 
 204
 As I have previously instructed, you have found a statutory aggravating circumstance by returning verdicts of guilty of causing the death of two persons. You will be given a written interrogatory on which to indicate if you find any statutory aggravating circumstances. If you do not unanimously find beyond a reasonable doubt the existence of any aggravating circumstance, you should indicate accordingly.
 
 
 205
 If you find one or more aggravating circumstance, you should next indicate on the written interrogatory that will be given to you whether the jury unanimously recommends that the death sentence be imposed.
 
 
 206
 If you recommend the death penalty, you will then indicate on the written interrogatory which statutory aggravating circumstance or circumstances, including the one found by your verdict, you relied upon in reaching your decision.
 
 APPENDIX D
 
 207
 Bailey Jury Interrogatories (Bailey JA at 241-42)
 
 
 208
 1. Does the jury unanimously find that the following statutory aggravating
 
 
 209
 circumstance or circumstances exist?
 
 
 210
 (a) The murders were committed by one who had escaped from a place of
 
 
 211
 confinement?
 
 Yes __X__ No _____
 
 212
 (b) The murders were committed while the defendant was engaged in flight
 
 
 213
 after committing Robbery?
 
 Yes __X__ No _____
 
 214
 (c) The defendant's course of conduct resulted in the deaths of two
 
 
 215
 persons where the deaths were a probable consequence of the
 
 
 216
 defendant's conduct?
 
 Yes __X__ No _____
 
 217
 (d) The murders were outrageously or wantonly vile, horrible or inhuman?
 
 Yes __X__ No _____
 
 218
 2. Does the jury unanimously recommend that a sentence of death be imposed?
 
 Yes __X__ No _____
 
 219
 3. If the jury unanimously recommends that a sentence of death be imposed,
 
 
 220
 plese [sic] indicate which statutory aggravating circumstance or
 
 
 221
 circumstances were relied upon.
 
 
 222
 (a) The murders were committed by one who had escaped from a place of
 
 
 223
 confinement.
 
 Yes _____ No _____
 
 224
 (b) The murders were committed while the defendant was engaged in flight
 
 
 225
 after committing Robbery.
 
 Yes _____ No _____
 
 226
 (c) The defendant's course of conduct resulted in the deaths of two
 
 
 227
 persons where the deaths were a probable consequence of the
 
 
 228
 defendant's conduct.
 
 Yes __X__ No _____
 
 229
 (d) The murders were outrageously or wantonly vile, horrible or inhuman.
 
 
 230
 Yes __X__ No _____LEWIS, Circuit Judge, dissenting.
 
 
 231
 As the cases before us in these appeals make abundantly clear, the death penalty has become the source of an increasingly vast and enormously complex body of constitutional law, posing issues which often defy clear or even sound resolution. Likewise, the immense implications that are at the core of our effort to correctly resolve these issues simply cannot be overstated. Both Bailey and Flamer raise profound and difficult questions about the application of Delaware's capital sentencing scheme to their cases. Because I cannot agree with the resolution of these issues by the majority of my colleagues, I respectfully dissent.
 
 
 232
 To begin, I agree with the majority that the plain language of the Delaware capital sentencing scheme suggests that it is a "non-weighing" scheme,[1] and that under the Delaware statute, the sentencing body may weigh all relevant evidence in aggravation and mitigation. See Del.Code.Ann. tit. 11, Sec. 4209(d)(1). I agree with petitioners, however, that jury interrogatory # 3 and the corresponding portion of the jury instructions converted the Delaware sentencing scheme, as applied, into a "de facto" weighing scheme.[2]
 
 
 233
 It is, perhaps, of even greater importance, however, that the differences between "non-weighing" and "weighing" capital sentencing schemes are not restricted to the scope of evidence a jury is entitled to rely upon during the penalty phase of a capital trial. As I discuss in greater detail below, and as the majority explicitly acknowledges, these differences extend to affect the standard of review that courts apply when determining the constitutionality of a death sentence. It is this latter point which renders the correct resolution of the "character" of the sentencing regime at issue in these cases of such profound constitutional and practical significance.
 
 
 234
 I gather that the majority and I agree that the chief culprit lurking behind the issues we must address may be singled out and identified as the now infamous interrogatory # 3. Interrogatory # 3, in my view, mistakenly suggested to the juries that at the selection stage, they were required to weigh statutory aggravating factors against any mitigating evidence, and that they could not impose a death sentence without relying upon one or more of those factors. I believe that by suggesting such a limitation, interrogatory # 3 injected into the sentencing process a "weighing" aspect, thereby transforming Delaware's statutory "non-weighing" scheme into a "weighing" scheme as applied.
 
 
 235
 The majority suggests that "[t]he worst that can fairly be said of the wording of [interrogatory # 3] is that it might be read to suggest that the jury could not recommend a death sentence unless it relied, at least in part, on a statutory aggravating circumstance." Maj.Op. at 752. The majority continues:
 
 
 236
 [E]ven if ... the juries had been left with the mistaken belief that they could consider only the statutory aggravating circumstance[s] at the selection step, we are at a loss to understand how this could have materially prejudiced these defendants. It is not claimed that interrogatory # 3 restricted the juries in their consideration of any evidence in mitigation, i.e., any evidence that might have been helpful to the defendants.... [I]t simply makes no sense to argue that death sentences should be overturned because the juries were unduly restricted in their consideration of the evidence militating in favor of the death penalty.
 
 
 237
 Id. at 752. The majority's inability to understand how the juries' mistaken belief could have prejudiced the defendants flows directly from what I perceive as its misunderstanding of the primary issue before us. It is not hard to see how such a misunderstanding could occur. Unfortunately (considering what is at stake), this area of the law is replete with nuances which require us to reach conclusions based upon inferences, and the appropriate analytical formulae shift depending upon how these underlying issues are perceived. Regrettably, as I will discuss later, neither the Supreme Court nor, in this case, the Delaware Supreme Court, have provided much helpful guidance. Yet achieving a proper understanding of the most fundamental issues here is critical, because the differences in the resulting analyses are, as I have said, of both constitutional and practical significance.
 
 
 238
 The primary issue we must address is not, as the majority suggests, whether interrogatory # 3 prevented the consideration of constitutionally relevant evidence, or whether it permitted the consideration of constitutionally impermissible evidence. Rather, the issue before us is whether interrogatory # 3 transformed the Delaware capital sentencing scheme into a "weighing" scheme, thereby signalling that the analytical framework under which these cases should be reviewed is the one set forth in Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); or whether Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), provides the pertinent standard for deciding if the death sentences in these cases were rendered unconstitutional by the consideration of constitutionally invalid statutory aggravating factors.[3]
 
 
 239
 Determining whether Clemons or Zant provides the proper lens through which to view these cases is nothing less than crucial because, as the majority acknowledges, under Clemons, if the jury in a "weighing" state relies upon one or more invalid statutory aggravating factors at the selection stage, "the[ ] death sentences cannot stand unless there is a judicial reweighing of the evidence without consideration of the invalid circumstances," Stringer v. Black, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); Clemons, 494 U.S. at 744-45, 110 S.Ct. at 1446-47. In "non-weighing" states, however, where the role of statutory aggravating factors is to "circumscribe the class of persons eligible for the death penalty," Zant, 462 U.S. at 878, 103 S.Ct. at 2743, a death sentence will not be disturbed so long as one valid statutory aggravating factor remains. See id. at 873-74, 103 S.Ct. at 2740-41. In other words, the correct characterization of the statutory scheme, under the unique circumstances of these cases, determines the appropriate standard of review which, in turn, has a direct bearing upon both the nature and the degree of relief to which the petitioners might be entitled, if any. Accordingly, a full appreciation of the differences between my view and that of the majority in these cases requires, first and foremost, an understanding of the distinctions--some, subtle; some, explicit; all, significant--between "non-weighing" and "weighing" capital sentencing schemes. And while the majority addresses these distinctions, I believe that they merit further discussion because of their importance to these cases.
 
 
 240
 Courts have cited a variety of factors in attempting to explain the differences between "non-weighing" and "weighing" capital sentencing schemes,[4] many of which fail to capture the true distinctions between these two types of statutes. For example, the Delaware Supreme Court itself has reasoned that its statute is "non-weighing" because although:
 
 
 241
 the jury ... is told to weigh and consider certain circumstances, the fact that they are not told how to weigh them and that this "weighing" occurs at the discretionary stage, renders defendant's argument [that Delaware is a weighing state] meaningless.
 
 
 242
 Flamer v. State, 490 A.2d 104, 131-36 (Del.1983). With all due respect, the Delaware Supreme Court's explanation of why its statute is "non-weighing" does not adequately address the most important distinction between these types of schemes.[5] In fact, the fundamental difference between a "non-weighing" and "weighing" statute is that under the former, the jury is allowed to consider in aggravation any evidence presented during the guilt or sentencing phases of the trial. As a result, in a "non-weighing" state, statutorily enumerated aggravating factors do not play a specific role in the jury's punishment determination. Put differently, the jury in a "non-weighing" state is not required--and, indeed, is not permitted--to weigh statutory aggravating factors as such in deciding whether to impose the death penalty. They are, however, free to consider the underlying facts that constitute the statutory aggravating factors. By contrast, under a "weighing" scheme, the jury can only consider statutorily enumerated aggravating factors in making its sentencing determination.
 
 
 243
 In practice, therefore, the "non-weighing"/"weighing" distinction logically and conceptually is better understood as a "non-limiting"/"limiting" distinction; that is, what differentiates a "non-weighing" from a "weighing" statutory scheme is not what weight is placed on aggravating circumstances, but rather whether the jury is limited to considering only statutory aggravating factors in deciding whether to impose a sentence of death.
 
 
 244
 It is essential to keep in mind that the reason why appellate scrutiny of the import and effect of invalid aggravating factors under the two schemes is different is because of the distinctly dissimilar roles that aggravating factors play in "weighing" and "non-weighing" schemes. As I discussed earlier, in a "non-weighing" state, statutory aggravating factors "[do] not play any role in guiding the sentencing body in the exercise of its discretion, apart from its function of narrowing the class of persons ... who are eligible for the death penalty." Zant, 462 U.S. at 873, 103 S.Ct. at 2740.
 
 
 245
 Because I believe that, through interrogatory # 3, statutory aggravating circumstances were given a specific function in guiding the juries' discretion at the selection stage, I cannot agree with the majority's conclusion that the Delaware scheme, as applied in these cases, is "non-weighing." Indeed, the Supreme Court has recognized as a distinctive element of a "non-weighing" scheme that statutory aggravating circumstances as such have "no specific function in the jury's decision whether a defendant who has been found to be eligible for the death penalty should receive it." Stringer, 503 U.S. at 229-30, 112 S.Ct. at 1136.[6]
 
 
 246
 Although the majority acknowledges that interrogatory # 3 is "potentially misleading and injects unnecessary confusion into the jury's deliberations," Maj.Op. at 754, and, in fact, "disapprove[s] of the practice of a judge in a non-weighing state using a jury interrogatory that asks which statutory aggravating circumstances the jury 'relied upon' in recommending the death penalty," it fails, in my opinion, to appreciate the constitutional significance of requiring that statutory aggravating circumstances play a role at the selection stage. The majority chooses to focus instead on (1) whether it is reasonably likely that interrogatory # 3 mistakenly suggested to the juries that, at the selection step, they could not rely on non-statutory aggravating circumstances but were limited to those aggravating circumstances set out in the Delaware statute, Maj.Op. at 751, and (2) whether interrogatory # 3 led the juries to give much greater weight or consideration to the facts underlying the invalid statutory aggravating circumstances than those facts would otherwise have received. Maj.Op. at 753. I will address these two issues in turn.
 
 
 247
 I note initially that these cases are distinguishable from Boyde v. California, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), relied upon by the majority, wherein the Supreme Court first adopted the "reasonable likelihood" standard of review for jury instructions. Consequently, I am not convinced that the Boyde inquiry is relevant in these cases.
 
 
 248
 In Boyde the issue was whether "the challenged instructions preclude[d] consideration of relevant mitigating evidence offered by the petitioner." Boyde, 494 U.S. at 386, 110 S.Ct. at 1201. In subsequent cases, the Boyde standard has been applied to determine " 'whether there is reasonable likelihood that the jury applied the challenged instruction in a way' that violates the Constitution," Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed. 385, 399 (1991) (quoting Boyde, 494 U.S. at 380, 110 S.Ct. at 1198), and whether there was a "reasonable likelihood" that the jury understood the charge to create an unconstitutional presumption. Rock v. Zimmerman, 959 F.2d 1237, 1247 (3d Cir.1992). I believe the challenge to the jury instructions in these cases is unique. The petitioners here do not simply claim that interrogatory # 3 was constitutionally impermissible; rather, they argue that interrogatory # 3 injected into the capital sentencing process a "weighing" aspect, thereby requiring that appellate review be conducted under Clemons instead of Zant.
 
 
 249
 But even if I were to agree with the majority that the Boyde standard applies in these cases, the relevant inquiry would be whether there is a reasonable likelihood that the juries thought they were required to rely on one or more statutory aggravating circumstances in order to impose a sentence of death. Although I believe that there is a reasonable likelihood that interrogatory # 3 led the juries to believe that they were required to rely only on statutory aggravating circumstances, I disagree with the majority that this finding is necessary in order to conclude that the Delaware statute as applied in these cases was weighing. To the contrary, if interrogatory # 3 induced the juries into believing that they were required to rely on one or more statutory aggravating circumstances in order to recommend the death penalty, that belief alone would suffice to convert Delaware's facially "non-weighing" scheme into a "weighing" scheme as applied in these cases, because the only logical conclusion is that they also believed they were required to weigh those statutorily defined aggravating circumstances against any mitigating evidence offered by petitioners.
 
 
 250
 That said, I believe the clear inference to be drawn from the language of interrogatory # 3 is that the death penalty could not be imposed unless the juries relied upon one or more statutory aggravating circumstances. Significantly, the juries were not asked to indicate which, if any, statutory aggravating circumstances were relied upon in reaching the decision to recommend the death penalty. They were specifically instructed to "indicate which statutory aggravating circumstance or circumstances were relied upon." See Appendix B, supra, at 761; Appendix D, supra, at 763-64 (emphasis added). Furthermore, nothing in the record indicates that the judges in these cases ever told the juries that they were not required to rely on statutory aggravating circumstances.[7]
 
 
 251
 In Bailey's case in particular, the potential for confusion as a result of this misleading instruction was exacerbated by the fact that the State never argued to the jury that there were non-statutory aggravating factors relevant for purposes of sentencing.[8] And although the judge may have instructed the jury that the State was allowed to "offer matters in aggravation besides statutory aggravating circumstances", Appendix A, supra, at 759, there is no indication in the record that the State ever argued that such evidence existed. The impact of the jury instructions, and interrogatory # 3 in particular, must be judged with this glaring omission in mind.
 
 
 252
 To more vividly demonstrate my point, I pose the following hypothetical which I believe illustrates why the jurors in Bailey's case were very likely left with the erroneous impression that they only could consider statutory aggravating factors in determining sentencing. Suppose that twelve laypersons are selected to act as an admissions committee for a university. As part of their orientation for the job, the group is required to attend a three-day training session where they are presented with large amounts of information relevant to the admissions process in general, and to their jobs as admissions officers in particular. Throughout the session, however, the group instructor continuously places emphasis only on four admissions criteria: (1) grades; (2) SAT scores; (3) extracurricular activities; and (4) recommendations.
 
 
 253
 At the final training session the group is told by their instructor that anything that is relevant for the purposes of evaluating an applicant can be relied upon by their committee, yet they are not given any specific indication of what factors other than grades, SAT scores, extracurricular activities and recommendations might qualify as relevant information, leaving these four factors as the only ones that specifically were identified. When the session ends, the committee is given a booklet that includes the training session information which focuses on the four factors, and a checklist with the following instructions:
 
 
 254
 Once you unanimously have agreed that an applicant should be admitted, please indicate on this written checklist the factor or factors you relied upon in deciding to admit the candidate.
 
 
 255
 These instructions are then followed with a checklist of four options:
 
 1. Grades __
 2. SAT Scores __
 3. Extracurricular Activities __
 4. Recommendations __
 
 256
 In my opinion, just as there is a reasonable likelihood that a member of our admissions committee could conclude that the only factors they could rely on in the admission process were the four set-out on the checklist, it is also quite likely that the jury in Bailey's case thought that it was limited to considering in aggravation only those statutory circumstances listed on interrogatory # 3. Thus, because the jury in Bailey's case was given instructions and interrogatories that reasonably could have lead it to deliberate as if operating under a "weighing" rather than "non-weighing" capital sentencing scheme, I believe Clemons provides the applicable standard of review.
 
 
 257
 Although I acknowledge that juries in "weighing" states are limited in their consideration of aggravating evidence to those aggravating circumstances enumerated in the statute, i.e., those factors which the legislature deemed relevant to the sentencing decision, I do not believe, as the majority does, that unless a jury is so limited, appellate scrutiny of the impact of invalid aggravating factors must be conducted under Zant. Accordingly, even though the prosecution in Flamer's case urged the jury to consider non-statutory aggravating factors in making its sentencing determination, in my view, Clemons still applies because the jury was also specifically instructed to weigh--and in fact did rely on--statutory aggravating circumstances.
 
 
 258
 The Supreme Court has never, to my knowledge, explicitly answered the question presented in these cases, namely, whether Clemons or Zant control when a death sentence is imposed under what is best described as a "hybrid" scheme--one which consists of both "weighing" and "non-weighing" characteristics. Again, because it is my belief that the introduction into the sentencing process of what I have referred to as a "weighing" aspect cannot be overlooked; I do not believe that these cases should be reviewed under Zant. Unlike Zant, in these cases, we know that a constitutionally invalid statutory aggravating factor was relied upon by the juries in recommending the death penalty; that is, we know that it was weighed against the mitigating evidence. Because allowing the sentencer to consider "a vague aggravating factor in the weighing process creates the possibility not only of randomness but also of bias in favor of the death penalty," Stringer, 503 U.S. at 235, 112 S.Ct. at 1139, we "may not assume it would have made no difference if the thumb had been removed from death's side of the scale." Id. 1139, 503 U.S. at 232, 112 S.Ct. at 1137.
 
 
 259
 Although I do not believe that Zant provides the appropriate analytical framework for review of these cases, I will briefly address the majority's analysis under Zant.
 
 
 260
 Despite the majority's conclusion to the contrary, these cases are distinguishable from Zant because the issue here is not, as it was in Zant, whether the challenged instruction "caused the jury to give somewhat greater weight [to the invalid statutory aggravating factors] than it otherwise would have given," Zant, 462 U.S. at 888, 103 S.Ct. at 2748.[9] In these cases, we are not dealing with the amount of weight that should be given to particular aggravating evidence. Instead, we must determine whether impermissibly vague aggravating factors can, without violating the Constitution, be given a specific function at the selection stage. The question we confront is not one of weight or, as the majority suggests, whether the facts underlying the vague factor are admissible and proper for consideration,[10] but a question of whether a weighing aspect may permissibly be injected at the imposition stage of a "non-weighing" scheme. This distinction may appear subtle, but it is significant because it directs us to the proper inquiry in these cases, i.e., whether interrogatory # 3 induced the juries to believe that they were required to rely on a statutory aggravating factor in order to impose the death penalty.
 
 
 261
 Because, as I have already stated, I believe that the clear inference to be drawn from interrogatory # 3 (and the jury instructions as a whole) is that the juries could not impose a death sentence without relying upon one or more statutory aggravating factors, it is my opinion that statutory aggravating factors served both a narrowing and a weighing function in these cases. I also believe that, in a "non-weighing" scheme, once a single statutory aggravating factor is found and the defendant is deemed death-eligible, statutory aggravating circumstances are to play no role in guiding the jury's discretion in reaching a sentencing determination. The fact that the statutory aggravating circumstances were given such a role in these cases leads me to the conclusion that petitioners' sentences were imposed in violation of the Constitution.
 
 
 262
 Having concluded that the sentencing process in each of these cases contained a constitutional error, the question arises whether courts of appeal are required to conduct a harmless error analysis. There is a split among the circuits as to whether a federal habeas court must conduct a harmless error analysis when reviewing a capital sentencing proceeding that involved an invalid statutory aggravating circumstance. Compare Smith v. Dixon, 14 F.3d 956, 974-81 (4th Cir.1994) (in banc) (holding that a federal habeas court must review constitutional errors of the state trial and sentencing proceedings for harmlessness) and Williams v. Clarke, 40 F.3d 1529, 1539-40 (8th Cir.1994) (same) with Wiley v. Puckett, 969 F.2d 86, 94 n.8 (5th Cir.1992) (holding that federal courts may not conduct harmless error analysis in the context of invalid statutory aggravating circumstances in capital sentencing proceeding) and Dixon, 14 F.3d at 988-93 (Sprouse, J. dissenting).
 
 
 263
 The Supreme Court has never explicitly authorized federal habeas courts to engage in the type of constitutional harmless error analysis that the Clemons Court authorized for capital sentencing proceedings. Nor has the Court foreclosed us from engaging in the analysis. Williams v. Clarke, 40 F.3d 1529, 1539 (8th Cir.1994). The Court's opinions authorizing harmless error analysis to remedy constitutional errors resulting from the consideration of a vague sentencing factor expressly refer only to state appellate courts. See, e.g., Richmond v. Lewis, 506 U.S. 40, ----, 113 S.Ct. 528, 535, 121 L.Ed.2d 411 (1992) ("[O]nly constitutional harmless-error analysis or reweighing at the trial level suffices to guarantee that the defendant received an individualized sentence. Where the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor, the state appellate court or some other state sentencer must actually perform a new sentencing calculus, if the sentence is to stand"); Stringer, 503 U.S. at 237, 112 S.Ct. at 1140 (holding that "use of a vague or imprecise aggravating factor in the weighing process invalidates the sentence and at the very least requires constitutional harmless-error analysis or reweighing in the state judicial system").
 
 
 264
 But the Court has "made plain that although a petitioner has demonstrated that his state trial was tainted with constitutional error, when the error is one that may be reviewed for harmlessness, a federal habeas court must not grant habeas relief unless the petitioner also demonstrates that the error 'had a substantial and injurious effect or influence in determining the jury's verdict.' " Dixon, 14 F.3d at 975 (quoting Brecht v. Abrahamson, --- U.S. ----, ----, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993)). Thus, a federal habeas court must determine that the error that occurred in the sentencing proceeding was harmful before it may grant habeas relief.
 
 
 265
 Under the standard announced in Brecht, I believe that both Bailey and Flamer have met the burden of demonstrating that the constitutional errors which occurred during their sentencing proceedings "had a substantial and injurious effect or influence in determining the jury's verdict[s]." Brecht, --- U.S. at ----, 113 S.Ct. at 1722. In Bailey's case, interrogatory # 3 reveals that the jury actually relied on two statutory aggravating factors at the selection stage. One of those two factors is invalid, however, because it is unconstitutionally vague. In my opinion, it is reasonable to conclude that the jury may well have reached a different outcome if it had not relied upon the invalid aggravating factor. In other words, the invalid circumstance may well have been the factor that tipped the scale in favor of death. Therefore, I am fairly certain that the error in Bailey's sentencing proceeding had a "substantial and injurious effect or influence in determining the jury's verdict." As a result of this "grave doubt", I am convinced that the error was not harmless. See O'Neal v. McAninch, --- U.S. ----, ---- - ----, 115 S.Ct. 992, 994-95, 130 L.Ed.2d 947 (1995) ("When a federal judge in a habeas proceeding is in grave doubt about whether a trial error ... had a 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless").
 
 
 266
 I reach the same conclusion with respect to Flamer, despite the fact that only one of the four statutory aggravating factors upon which the jury relied was invalid, because I believe that it may well have been the invalid circumstance that tipped the scale in favor of death. Although the jury in Flamer's case indicated that it had relied on four statutory aggravating circumstances,[11] I nevertheless have grave doubts as to whether the jury would have recommended the death penalty had the invalid factor not been part of the equation. Significantly, two of the remaining valid statutory aggravating circumstances--that the murder was committed while the defendant was engaged in the commission of a robbery and that the murder was committed for pecuniary gain--are, in my opinion, duplicative. Although the existence of the duplicative circumstances does not, itself, constitute constitutional error, I believe it is both proper and necessary to consider the impact of the duplication as part of a harmless error analysis conducted for the purpose of determining whether the jury would have recommended the death penalty had it not relied upon the unconstitutionally vague and invalid aggravating circumstance. Because I believe that the two duplicative factors represent a single aggravating factor and, as a result, that the jury actually relied only upon two valid statutory aggravating factors, I am convinced that the error, i.e., the consideration of a unconstitutionally vague aggravating circumstance, had a "substantial and injurious effect or influence in determining the jury's verdict." Where the number of statutory aggravating factors relied upon is so substantially diminished (in this case by 50 percent), not only may we not "assume it would have made no difference if the thumb had been removed from death's side of the scale," Stringer, 503 U.S. at 232, 112 S.Ct. at 1137, I believe we are compelled to conclude that the error was not harmless.
 
 
 267
 For the reasons set forth above, I respectfully dissent.
 
 
 268
 Although I have concluded that the errors in both trials were not harmless and would, accordingly, reverse the death sentences as to both Bailey and Flamer and remand for reweighing, the tortuous analytical route it has taken both the majority and me to set out our respective views in these cases compels me to add that I believe they perfectly illustrate--perhaps epitomize--why, in the words of Justice Blackmun, we should "no longer tinker with the machinery of death." See Callins v. Collins, --- U.S. ----, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting).
 
 
 269
 To be sure, Justice Blackmun was correct. I realize that I sit on a court charged with the responsibility of applying the law as it is interpreted by the Supreme Court, and in circumstances such as these, by the highest court of a state. That is precisely what the majority and I have sought to do, despite our disagreement. But there are times when it becomes appropriate for a judge to reflect upon the law that he or she is called upon to apply, and to express views, genuine and unfeigned, that reveal a sincere and earnest belief. And in doing so here, I can only say that more than any I have seen, these cases exemplify the extent to which death penalty jurisprudence has become so complex and theoretically abstract that the only way to try to understand the reasons for and impact of its many subtle distinctions is to resort to carefully crafted hypotheticals. Something is terribly wrong when a body of law upon which we rely to determine who lives and who dies can no longer, in reality, reasonably and logically be comprehended and applied; when, in examining a statutory scheme and analyzing instructions and interrogatories, we are left to reach conclusions by piling nuance upon nuance; when we cannot even agree upon the appropriate standard of review in cases in which lives hang in the balance. Yet this is how cluttered and confusing our nation's effort to exact the ultimate punishment has become. This cannot be what certain fundamental principles of liberty and due process embodied in our Constitution, principles upon which I need not elaborate here, are all about.
 
 
 270
 It does not dilute my profound respect for the highest court in the land, an admiration and honor that knows no bounds, to voice an apprehension, sincerely felt, that much more guidance in this serious moral dilemma must be forthcoming. Elusive and complicated distinctions, replete with incomprehensible subtleties of the highest order, must not be the talisman that decides whether one should live or die. Until this guidance is forthcoming, the plaintive voice of Justice Blackmun, truly crying in the wilderness, should continue to haunt and remind us that "the desired level of fairness has [not] been achieved."
 
 
 271
 Joined by Judge MANSMANN and Judge McKEE.
 
 
 272
 SAROKIN, Circuit Judge, dissenting.
 
 
 273
 I respectfully dissent.
 
 
 274
 Accepting that Delaware is a "non-weighing" state, I conclude that the instructions and interrogatories submitted in these two cases shifted the neutral balance contemplated under the statute and with it, the scales of justice as well. Rather than directing the consideration of all mitigating and aggravating factors in the final stage, each court focussed on aggravating circumstances and enhanced their consideration by designating them as "statutory." The combination of these errors with the submission of a critical "statutory" factor deemed to be unconstitutional raises such errors to the level of a constitutional defect.
 
 
 275
 It may be that because of the evidence presented in this case, the jury would have imposed the death penalty in any event. However, it is impossible to determine the extent to which the courts' instructions influenced the juries' determinations, and whether the juries would have imposed the death penalty absent those instructions and interrogatories. This being the death penalty--the ultimate punishment--ambiguities should be resolved in favor of the defendant, and the matter remanded for reconsideration.
 
 I.
 
 276
 Death penalty statutes in the various states can be divided into two separate categories. In so-called non-weighing states, jurors in the sentencing phase of the trial must find beyond a reasonable doubt the presence of at least one of various aggravating factors specified in the statute. Once this threshold finding is made, the jury proceeds to a discretionary stage where it can consider any aggravating factor as well as any mitigating factor.[1] In so-called weighing states, the threshold requirement is the same, but the jury at the discretionary stage is limited to consideration of the statutorily specified aggravating factors.
 
 
 277
 The Supreme Court has devised bifurcated tracks for reviewing death penalty sentences in which the jury relied on unconstitutional statutory aggravating factors, distinguishing between the two different types of statutes. In Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Court held that consideration of an unconstitutional statutory factor in a non-weighing state, when other statutory factors were also found by the jury, does not warrant reversal. In Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), the Court held that consideration of an unconstitutional statutory factor in a weighing state is cause for reversal, even if other statutory factors were found. The distinction upon which the Court relied was that in non-weighing states, the jury at the discretionary stage was entitled to consider any aggravating factor, not simply those articulated in the statute. Therefore, consideration of a statutory aggravating factor deemed unconstitutional did not impermissibly broaden the range of aggravating evidence that the jury could consider. Zant, 462 U.S. at 886, 103 S.Ct. at 2747 ("The underlying evidence is ... fully admissible at the sentencing phase."). At most, it gave one factor more attention than warranted by requiring consideration of that factor by the jury at the eligibility stage. Id. at 888, 103 S.Ct. at 2748. But any prejudice that the defendant might suffer would be quite remote, in the Court's view, because no emphasis was placed on statutory factors at the discretionary stage. Id. at 889, 103 S.Ct. at 2749.
 
 
 278
 In a weighing state, on the other hand, the jury's consideration of aggravating factors at the discretionary stage is limited to those enumerated by statute. Therefore, inclusion of an unconstitutional statutory factor at the discretionary stage broadens the range of aggravating factors that the jury can consider beyond what is constitutionally permissible, since the extra aggravating factor might have been decisive in imposing the sentence of death. The Court held in Clemons that in those instances the sentence should be vacated and either remanded to the state appellate court for reweighing or subjected to harmless error analysis. 494 U.S. at 741, 110 S.Ct. at 1444.
 
 II.
 
 279
 The juries in both Bailey and Flamer were presented with an unconstitutional statutory factor, specifically, that "[t]he murders were outrageously or wantonly vile, horrible or inhuman." Majority Opinion ("Maj.Op."), appendix A at 760, appendix C at 762. However, the situation in these two cases does not comport with the weighing/non-weighing analysis that has evolved from Supreme Court jurisprudence. I do not dispute the majority's determination that Delaware is a non-weighing state, Maj.Op. at 749; however, in both Bailey and Flamer the instructions issued and interrogatories submitted to the juries gave heightened significance to statutory aggravating factors at the discretionary stage,[2] and thus introduced a weighing dimension to those juries' considerations. The issue presented is, how are we to apply existing Supreme Court law in a hybrid case such as this?
 
 
 280
 I do not think it appropriate to cram our case into one of the conceptual boxes designed by the Supreme Court. Neither fits precisely. Instead, we must step back and, as the Court did in Zant and Clemons, try to understand and predict how the instructions and interrogatories affected, or may have affected, the jury.
 
 III.
 
 281
 First, I agree with the majority that the inclusion of an unconstitutional statutory factor at the eligibility stage, in and of itself, does not warrant reversal when other statutory factors are present. Maj.Op. at 747. That is the clear mandate of Zant.
 
 
 282
 I further agree with the majority that neither Bailey nor Flamer was prejudiced by the mere consideration of the unconstitutional statutory factor at the discretionary stage. As the majority notes, the jury at that stage is entitled to consider all factors either supporting or negating the imposition of death on the defendants. Maj.Op. at 752. In particular, the jury is entitled to take into account whether the murders were "outrageously or wantonly vile, horrible or inhuman."
 
 
 283
 The issue, however, is not whether the juries were entitled to consider evidence of the vileness of Bailey's and Flamer's acts. Rather, the issue is the weight that this factor played in the juries' deliberations because of the courts' instructions and interrogatories, and whether this compelled consideration of the statutory factors at the discretionary stage may have unduly prejudiced Bailey and Flamer.
 
 
 284
 In both cases, Interrogatory # 3 asked the jury to specify upon which statutory factors it relied in reaching its verdict of death. By asking the jury to specify what statutory aggravating factors it took into consideration, but not asking the jury a similar question regarding mitigating factors, Interrogatory # 3 focussed the jurors' attention on those very factors that would most likely lead them to impose the death penalty. While the judges in both Bailey and Flamer instructed the juries that they could take into consideration "all relevant evidence in aggravation or mitigation," Maj.Op., append. A at 759, append. C. at 762, the instructions and interrogatory had the effect of signaling to the jury that when all was said and done, they should pay particular attention to certain considerations. In Bailey, these considerations were: (1) whether, when committing the murders, Bailey "had escaped from a place of confinement"; (2) whether he "was engaged in flight after committing Robbery"; (3) whether his "course of conduct resulted in the deaths of two persons where the deaths were a probable consequence of the defendant's conduct"; and (4) whether "[t]he murders were outrageously or wantonly vile, horrible or inhuman." Maj.Op., append. D at 763-64. In Flamer, the judge gave special salience to the following factors: (1) whether Flamer killed his victims while he "was engaged in the commission of a robbery"; (2) whether his "course of conduct resulted in the deaths of two or more persons where the deaths are a probable consequence of the defendant's conduct"; (3) whether "[t]he murders were outrageously or wantonly vile, horrible or inhuman"; and (4) whether "[t]he murder was committed for pecuniary gain." Maj.Op., append B. at 761. It is reasonable to conclude that Interrogatory # 3, by so directing the juries' attention, gave added weight to those aggravating factors articulated by the judges and diminished the juries' consideration of mitigating factors. Because in non-weighing states, "the finding of [a statutory] aggravating circumstance does not play any role in guiding the sentencing body in the exercise of its discretion" beyond eligibility, Zant, 462 U.S. at 874, 103 S.Ct. at 2741, requiring that aggravating circumstances play such a role was error.
 
 
 285
 To understand the prejudice that the judges' instructions may have caused, it may be helpful to consider a different scenario: imagine that, instead of Interrogatory # 3, the judge in Flamer had directed the jury to indicate which of the following factors they relied on in reaching their sentence: Flamer's "dull normal" intelligence, the role of the co-defendant, Andre Deputy, in the murders, Flamer's struggle with alcoholism, the reports of a psychologist and psychiatrist, and the testimony of Flamer's mother and grandmother. Joint Appendix at 1482, 1486. It is not difficult to imagine the prosecution's outraged reaction to such an interrogatory, and the impact it might have had on the ultimate sentence. The impact was no less great and prejudicial when, as actually happened, the courts directed the juries to look particularly closely at the gravity and horror of Bailey's and Flamer's acts, but not at anything which might tend to mitigate.
 
 IV.
 
 286
 While I urge that casting a bright light on those factors most likely to bring about a sentence of death was unconstitutionally prejudicial, I conclude that such error was further compounded by the fact that one of the factors thus singled out for the juries' attention was unconstitutionally included in the list of statutory factors.
 
 
 287
 While the majority does acknowledge that awarding one factor the imprimatur of statutory factor may give it heightened significance over other factors, it argues that in Zant, "the Supreme Court recognized that [the statutory label "aggravating circumstance"] 'arguably might have caused the jury to give somewhat greater weight to petitioner's prior criminal record than it otherwise would have given.' " Maj.Op. at 753 (quoting Zant, 462 U.S. at 888, 103 S.Ct. at 2748). "Nevertheless, the Court held that 'any possible impact' resulting from the use of that label 'could not fairly be regarded as a constitutional defect in the sentencing process.' " Maj.Op. at 753 (quoting Zant, 462 U.S. at 889, 103 S.Ct. at 2749).
 
 
 288
 Zant, however, is not applicable here. In Zant, "[t]he instructions did not place particular emphasis on the role of statutory aggravating circumstances in the jury's ultimate decision." 462 U.S. at 889, 103 S.Ct. at 2749 (emphasis added) (citation omitted). "Instead the trial court instructed the jury to 'consider all of the evidence received in court throughout the trial before you' and to 'consider all facts and circumstances presented in extinuation [sic], mitigation and aggravation of punishment as well as such arguments as have been presented for the State and for the Defense.' " Id. In Bailey and Flamer, however, the judges' instructions did place particular emphasis on the role of statutory factors at the discretionary stage. Furthermore, there is no indication that the jury in Zant received the sort of interrogatory that is central to our concern here. In other words, while the jury was instructed in Zant to consider an impermissible statutory factor at the eligibility stage, it received no such direction regarding the discretionary stage.
 
 
 289
 Contrary to the majority, I find this difference to be "of constitutional dimension." It is, in fact, fundamental. Sentencing in death penalty cases requires two distinct and sequential stages: eligibility and discretion. Because the statutory factors in Zant played no role whatsoever in guiding the jury at the discretionary stage, id. at 874, 103 S.Ct. at 2741, "the jury's ultimate decision," id. at 889, 103 S.Ct. at 2749, was not itself marred by constitutional error; any prejudice against Zant would have resulted from the residual effect of considering that factor at an earlier stage in the trial (the eligibility stage). In the cases before us, however, the jury's attention was once again focussed on the statutory factors at the discretionary stage. In fact, the judges in their interrogatories singled out the statutory factors for the juries' special consideration. In other words, whereas in Zant the statutory factors may have been in the recesses of the jurors' memories at the discretionary stage, they were made current and predominant in Bailey and Flamer. The statutory factors, which played no role in the jury's "ultimate decision" in Zant, played the central role in the jury's ultimate decisions that Bailey and Flamer should be put to death.
 
 V.
 
 290
 I conclude that in Delaware's non-weighing scheme, at the discretionary stage, (1) the forced consideration of some aggravating but no mitigating factors, compounded by the enhanced designation of those factors as "statutory," and (2) the mischaracterization of an aggravating factor as statutory at the discretionary stage, amount to constitutional defect and are grounds for reversal.
 
 
 291
 As with the inclusion of an invalid factor in a weighing scheme, when this combination of errors occurs, we cannot "assume it would have made no difference if the thumb had been removed from death's side of the scale." Stringer v. Black, 503 U.S. 222, 232, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992).
 
 VI.
 
 292
 Because I conclude that the sentencing of both Bailey and Flamer was tainted with constitutional error, I now address the issue of harmless error. The United States Supreme Court recently held that "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error ... had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless." O'Neal v. McAninch, --- U.S. ----, ----, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995).
 
 
 293
 As should be clear from my foregoing analysis, I harbor such "grave doubts" in this instance. In each case, the judge's instructions, coupled with the interrogatory, unduly focussed the jury's attention at the discretionary stage on the statutory factors--presumably the most damning considerations in support of a death sentence. By drawing attention to those factors, each judge necessarily magnified their importance and diminished the jurors' attention to those factors arguing against a sentence of death. It is unarguable that drawing the jurors' attention to one type of factors over another would have a "substantial and injurious effect or influence in determining the jury's verdict." As Judge Lewis argues, inclusion in the list of statutory factors (which totalled four in both Bailey and Flamer ) of an unconstitutionally vague factor may well have been a deciding factor as well in the imposition of the death sentence. Therefore, I find that the errors were not harmless.
 
 VII.
 
 294
 For this reason, I would vacate the death sentences of William Henry Flamer and Billie Bailey and remand for further proceedings consistent with this opinion.
 
 
 
 *
 Judge Hutchinson participated in the argument and conference of the in banc court in these appeals, but he died before the filing of the opinion
 
 
 [1]
 The language of this provision today is substantially the same:
 A sentence of death shall be imposed, after considering the recommendation of the jury, if a jury is impaneled, if the Court finds:
 a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and
 b. By a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist.
 Del.Code Ann. tit. 11, Sec. 4209(d) (Supp.1994).
 
 
 [2]
 These were:
 a. The murder was committed by a person in, or who has escaped from, the custody of a law-enforcement officer or place of confinement.
 b. The murder was committed for the purpose of avoiding or preventing an arrest or for the purpose of effecting an escape from custody.
 c. The murder was committed against any law-enforcement officer, corrections employee or fireman, while such victim was engaged in the performance of his official duties.
 d. The murder was committed against a judicial officer, a former judicial officer, Attorney General, former Attorney General, Assistant or Deputy Attorney General or former Assistant or Deputy Attorney general, State Detective or former State Detective, Special Investigator or former Special Investigator, during, or because of, the exercise of his official duty.
 e. The murder was committed against a person who was held or otherwise detained as a shield or hostage.
 f. The murder was committed against a person who was held or detained by the defendant for ransom or reward.
 g. The murder was committed against a person who was a witness to a crime and who was killed for the purpose of preventing his appearance or testimony in any grand jury, criminal or civil proceeding involving such crime.
 h. The defendant paid or was paid by another person or had agreed to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.
 i. The defendant was previously convicted of another murder or manslaughter or of a felony involving the use of, or threat of, force or violence upon another person.
 j. The murder was committed while the defendant was engaged in the commission of, or attempt to commit, or flight after committing or attempting to commit any degree of rape, arson, kidnapping, robbery, sodomy or burglary.
 k. The defendant's course of conduct resulted in the deaths of 2 or more persons where the deaths are a probable consequence of the defendant's conduct.
 l. The murder was committed by means of torture, use of an explosive device or poison, or the defendant used such means on the victim prior to murdering him.
 m. The defendant caused or directed another to commit murder or committed murder as an agent or employee of another person.
 n. The murder was outrageously or wantonly vile, horrible or inhuman.
 o. The defendant was under a sentence of life imprisonment, whether for natural life or otherwise, at the time the commission of the murder.
 p. The murder was committed for pecuniary gain.
 q. The victim was pregnant.
 r. The victim was severely handicapped, severely disabled or elderly.
 s. The victim was defenseless.
 
 
 [3]
 Del.Code Ann. tit. 11, Sec. 636(a) provided:
 (a) A person is guilty of murder in the first degree when:
 (1) He intentionally causes the death of another person;
 (2) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he recklessly causes the death of another person;
 (3) He intentionally causes another person to commit suicide by force or duress;
 (4) He recklessly causes the death of a law enforcement officer, corrections employee or fireman while such officer is in the lawful performance of his duties;
 (5) He causes the death of another person by the use of or detonation of any bomb or similar destructive device;
 (6) He, with criminal negligence, causes the death of another person in the course of and in furtherance of the commission or attempted commission of rape, kidnapping, arson in the first degree, robbery in the first degree, or immediate flight therefrom;
 (7) He causes the death of another person in order to avoid or prevent the lawful arrest of any person, or in the course of and in furtherance of the commission or attempted commission of escape in the second degree or escape after conviction
 Thus, if a defendant was convicted of first-degree murder under subsection (1)--for "intentionally causing the death of another person"--no statutory aggravating circumstance would automatically be deemed to have been established. However, if a defendant was convicted under subsections (2)-(7), a statutory aggravating circumstance would be deemed to have been proven.
 
 
 [4]
 Del.Code Ann. tit. 11, Sec. 4209(e)(1)k
 
 
 [5]
 Del.Code Ann. tit. 11, Sec. 4209(e)(1)n
 
 
 [6]
 Del.Code Ann. tit. 11, Sec. 4209(e)(1)p
 
 
 [7]
 Although the Delaware statute described the jury's decision as a "recommendation," this decision, if supported by the evidence, was "binding on the Court." Del.Code Ann. tit. 11, Sec. 4209(d)(1)b
 
 
 [8]
 Justice Stewart's plurality opinion was joined by three other justices. Justice Marshall, joined by Justice Brennan, concurred in the judgment. Justice Marshall "agree[d] with the plurality that, as applied in this case, [the aggravated circumstance at issue was] unconstitutionally vague," 446 U.S. at 435, 100 S.Ct. at 1768 (Marshall, J., concurring in the judgment), but he also expressed the view that reversal was required on broader grounds. Id. at 433, 435-42, 100 S.Ct. at 1767, 1768-72
 
 
 [9]
 Zant is discussed in greater detail below. See infra pages 746-47
 
 
 [10]
 Del.Code Ann. tit. 11, Sec. 4209(e)(1)a
 
 
 [11]
 Del.Code Ann. tit. 11, Sec. 4209(e)(1)j
 
 
 [12]
 Del.Code Ann. tit. 11, Sec. 4209(e)(1)k
 
 
 [13]
 Del.Code Ann. tit. 11, Sec. 4209(e)(1)n
 
 
 [14]
 Similarly, in Stringer v. Black, 503 U.S. 222, 231, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992), the Court observed that "[i]n a nonweighing state, so long as the sentencing body finds at least one valid aggravating factor, the fact that it also finds an invalid aggravating factor does not affect the formal process of deciding whether death is an appropriate penalty." In a "weighing" state, however, the Court observed:
 [W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale. When the weighing process itself has been skewed, only constitutional harmless-error analysis or reweighing at the trial or appellate level suffices to guarantee that the defendant received an individualized sentence.
 Id.
 
 
 [15]
 See supra page 741
 
 
 [16]
 In Flamer's case, three statutory aggravating circumstances were listed. One additional circumstance was deemed by statute to have been proven as a result of the jury's verdict at the guilt phase and was therefore not listed. See supra page 741. In Bailey's case, four statutory aggravating circumstances were listed
 
 
 [17]
 In both cases, four statutory aggravating circumstances were listed after interrogatory three
 
 
 [18]
 As noted, the corresponding portion of the instructions stated:
 If you recommend the death penalty, you will then indicate on the written interrogatory which statutory aggravating circumstance or circumstances ... you relied upon in reaching your decision.
 
 
 [19]
 It is noteworthy that none of the participants in either trial seemed to think that this wording presented any problems. As noted, the same interrogatory form was used and the same corresponding instructions were given by two different trial judges. The record does not reflect that either Flamer's or Bailey's trial counsel objected to the wording of interrogatory # 3 or the corresponding portion of the instructions. Moreover, although the implication now attributed to interrogatory # 3 was potentially damaging to the prosecution, the prosecutors did not object to this wording in either case
 
 
 [20]
 While we do not find constitutional error in these cases, we strongly disapprove of the practice of a judge in a non-weighing state using a jury interrogatory that asks which statutory aggravating circumstance the jury "relied upon" in recommending the death penalty. Because statutory aggravating circumstances have no special significance at the "selection" phase, such an interrogatory is potentially misleading and injects unnecessary confusion into the jury's deliberations
 
 
 [21]
 As noted, Flamer's other arguments are addressed in a separate panel opinion that is being filed simultaneously with this opinion
 
 
 [22]
 See 500 U.S. at 418-19, 111 S.Ct. at 1901-02
 
 
 [23]
 See Yount v. Patton, 710 F.2d 956, 962-63 (3d Cir.1983), rev'd, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)
 
 
 [24]
 These questions concerned the venirepersons' bias for or against the defendant, as well as their familiarity with the case, the defendant, the attorneys, the prospective witnesses, the victims and their family members, and any employees of a police agency or the state Attorney General's office. See 855 F.Supp. at 1406
 
 
 [25]
 The district court also held, and the state has argued on appeal, that the nonretroactivity principle of Teague v. Lane, 489 U.S. 288, 300, 109 S.Ct. 1060, 1069-70, 103 L.Ed.2d 334 (1989), precludes consideration of Bailey's Cage argument. The question whether Cage may be applied retroactively in habeas proceedings has divided the courts of appeals. Compare Skelton v. Whitley, 950 F.2d 1037, 1043 (5th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 102, 121 L.Ed.2d 61 (1992) (not retroactive) with Adams v. Aiken, 41 F.3d 175, 177-78 (4th Cir.1994), cert. denied. --- U.S. ----, 115 S.Ct. 2281, 132 L.Ed.2d 284 (1995) (retroactive) and Nutter v. White, 39 F.3d 1154 (11th Cir.1994) (same). While the question of retroactivity under Teague should be decided before reaching the merits of a habeas claim, see Caspari v. Bohlen, --- U.S. ----, ----, 114 S.Ct. 948, 953, 127 L.Ed.2d 236 (1994), neither binding precedent nor logic seems to require that the question of retroactivity be considered prior to the question of procedural default. Accordingly, we have turned first to the question of procedural default and have thus found it unnecessary to reach the complicated issues related to Teague
 
 
 [26]
 In an effort to suggest that the jury might not have found the existence of this statutory aggravating circumstance were it not for the challenged instruction, Bailey points out that the jury sent a note to the trial judge during its deliberations stating that it was "troubled somewhat with the word 'probable' in the third statutory aggravating circumstance listed in [the] charge." Bailey JA at 200(A). Bailey seems to suggest that this note revealed that the jury was not sure whether the deaths of the Lambertsons were the "probable" consequence of Bailey's conduct. This suggestion, however, appears far-fetched. Since the same jury had found in the verdicts returned on Friday, February 22, 1980, that Bailey had intentionally killed the Lambertsons, it is hard to see how the jury could doubt on Monday, February 25, 1980, when the note was sent to the judge, that the Lambertsons' deaths were the probable consequences of Bailey's conduct
 There is a far more likely explanation for the jury's note: the jury may not have understood that the probability standard set out in the statutory aggravating circumstance was merely the minimum necessary. In other words, since the evidence showed that Bailey shot both Lambertsons multiple times at close range with a shotgun and pistol and since the jury had already found that he intended to kill them, the jury may not have completely understood that the probability standard in the statutory aggravating circumstance could be satisfied by proof that the Lambertsons' deaths were not merely the probable consequences of Bailey's conduct but the intended and almost certain consequences of those actions. Accordingly, we are convinced that any error was harmless.
 
 
 [27]
 In a habeas proceeding, the appropriate harmless error standard is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' " Brecht v. Abrahamson, --- U.S. ----, ----, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). See also O'Neal v. McAninch, --- U.S. ----, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). That standard was plainly met here
 
 
 [1]
 Although the majority apparently believes that it is crystal clear from the statute's plain language that Delaware's capital sentencing scheme is "non-weighing", a close examination of Delaware Supreme Court case law itself contradicts this view
 In Whalen v. State, 434 A.2d 1346 (Del.1980), Frank Cole Whalen Jr. was tried, convicted and sentenced to death on charges of first degree murder, burglary and rape. At Whalen's sentencing hearing the jury was instructed to consider as statutory aggravating circumstances, the fact that the victim was "elderly" and "defenseless". On appeal, citing State v. White, 395 A.2d 1082 (Del.1978), in which the Delaware Supreme Court had held that the "elderly" and "defenseless" statutory aggravating were unconstitutionally vague, Whalen argued that he was entitled to a new sentencing hearing on the ground that the jury had considered invalid statutory aggravating circumstances in determining his sentence. In granting Whalen relief, the Delaware Supreme Court reasoned that although "the defendant was found guilty of rape, itself a statutory aggravating circumstance, we are not prepared to assume the defendant was not prejudiced by this error", a conclusion that could not have been reached under a "non-weighing" statute.
 The ruling in Whalen necessarily implies that at a previous point in time the Supreme Court of Delaware treated its capital sentencing scheme as "weighing". It is, then, at best curious, and at worst flat-out anomalous, that the supreme court's ruling in Flamer v. State, 490 A.2d 104, 131-136 (Del.1983), proclaiming that Delaware's statute is "non-weighing," made no mention of overruling Whalen and did not attempt to reconcile the two cases. As a result, although it now may be the case that Delaware's statute is "non-weighing," that has not always clearly been the case.
 
 
 [2]
 For convenience and consistency, I too, will use the term "interrogatory # 3" to refer to both the interrogatory itself and corresponding instructions
 
 
 [3]
 As the majority notes, the juries in both cases considered an unconstitutionally vague statutory aggravating circumstance, i.e., that "[t]he murder was outrageously or wantonly vile, horrible, or inhuman." See Del.Code Ann. tit. 11, Sec. 4209(e)(1)n
 
 
 [4]
 See Williams v. Calderon, 52 F.3d 1465, 1477 n. 13 (9th Cir.1995) (discussing the varying factors courts rely upon to differentiate "weighing" from "non-weighing" capital sentencing schemes.)
 
 
 [5]
 The difference between a "non-weighing" and "weighing" statutory scheme is not primarily based on "how" the jury is told to weigh the evidence, but rather "what" evidence the jury is allowed to consider
 
 
 [6]
 Some commentators refer to "non-weighing" schemes as "threshold schemes," and have described the difference between "weighing" and "threshold" schemes as follows:
 In a "threshold" state, the sentencer has complete discretion in assessing a sentence once it has found that the defendant passes the death eligible threshold, i.e., once it finds the existence of a single aggravating circumstance. In such a system, aggravating circumstances perform one function: to set the death-eligible threshold. In contrast, aggravating circumstances in "weighing" states perform two functions. Not only do they set the death-eligible threshold, they also guide the jury's decision beyond that point insofar as they are weighed or balanced by the jury against mitigating circumstances in order to arrive at a sentence.
 John H. Blume & Stephen P. Garvey, Harmless Error in Federal Habeas Corpus After Brecht v. Abrahamson, 35 Wm. & Mary L.Rev. 163, 192-93 (1993) (footnotes omitted).
 
 
 [7]
 The majority suggests that to the extent that the juries may have felt confused by interrogatory # 3 and possibly conflicting instructions given by the court, it was incumbent upon the juries to seek clarification. Maj.Op. at 752
 I would point out that in capital cases, the Delaware Supreme Court has observed, quite appropriately, that "it is the trial judge's duty to guide the jury's discretion by ensuring that they understand the bases for imposing a death sentence, and comprehend their responsibilities in applying such criteria. It is only through the careful use of jury instructions that the judge properly discharges this function." Whalen v. State, 492 A.2d 552, 559 (Del.1986).
 More importantly, however, the record clearly reflects the fact that during deliberations in Bailey's case the jury did seek clarification from the trial judge regarding the "multiple death" statutory aggravating circumstance. In particular, the jury noted that it was "troubled somewhat with the word 'probable'," app. at 200(a), contained in the statutory language. In replying to the jury's concerns, the trial judge offered the following response: "I ... want to remind you that you needn't dwell on that ["multiple death"] circumstance too much because, as I have told you in the charge, you have already found that one to exist by virtue of your verdict...." Id. Undoubtedly, this "clarification" only increased the likelihood that the jury was misled into thinking that in the final, discretionary, imposition stage of its deliberations, it was required to rely on the "multiple death" statutory aggravating factor, regardless of any confusion or doubts it might have had about this circumstance.
 
 
 [8]
 As the majority points out, and I acknowledge, the prosecution in Flamer's case did urge the jury to consider non-statutory aggravating factors in its sentencing determination
 
 
 [9]
 In Zant, the Supreme Court upheld a Georgia death sentence imposed under a "non-weighing" scheme and agreed with the Georgia Supreme Court that the " 'mere fact that some of the aggravating circumstances were improperly designated statutory' ... did not place particular emphasis on the role of statutory aggravating circumstances in the jury's ultimate decision." Zant v. Stephens, 462 U.S. 862, 889, 103 S.Ct. 2733, 2749, 77 L.Ed.2d 235 (1983). As a result, the Court concluded that any possible impact of the state's "aggravating factor" imprimatur on an otherwise admissible consideration "cannot fairly be regarded as a constitutional defect in the sentencing process." Id
 
 
 [10]
 The majority insists that "even if the juries had believed that they could not consider non-statutory aggravating factors at the selection step, this would not naturally cause the juries to give the facts underlying the invalid statutory aggravating circumstances any greater weight than those facts would have otherwise received." Maj.Op. 753. In its attempt to confine these cases within the parameters of Zant, the majority refuses to acknowledge that under a "weighing" scheme, the consideration of an invalid factor which, in turn, allows consideration of the circumstances supporting the factor, permits the jury to include in its sentencing calculus evidence that could not have otherwise been considered. See Williams v. Calderon, 52 F.3d 1465, 1477 (9th Cir.1995)
 
 
 [11]
 The four statutory aggravating circumstances indicated by the Flamer jury in response to interrogatory # 3 were as follows:
 (a) The murder was committed while the defendant was engaged in the commission of a robbery.
 (b) The defendant's course of conduct resulted in the deaths of two or more persons where the deaths are a probable consequence of the defendant's conduct.
 (c) The murder was outrageously or wantonly vile, horrible or inhuman.
 (d) The murder was committed for pecuniary gain.
 See Appendix B, supra, at 761.
 
 
 [1]
 The majority refers to this second stage as the "selection" step. Majority Opinion at 741. Because I find this term ambiguous, I use instead the term "discretionary stage" throughout this dissent
 
 
 [2]
 The majority does not actually dispute this claim, though it falls short of endorsing it either. See Maj.Op. at 752 ("The worst that can fairly be said of the wording of this interrogatory question is that it might be read to suggest that the jury could not recommend a death sentence unless it relied, at least in part, on a statutory aggravating circumstance."). However, it deems to "see no merit in this argument" at a later point in the opinion. Maj.Op. at 753
 Moreover, the majority focusses on the fact that the instructions and interrogatory did not preclude consideration of other aggravating circumstances, see Maj.Op. at 751, 752-54 and that accordingly Zant governs. Maj.Op. at 753. Because my dissent in no way relies on this question, I do not address the majority's claim.